1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

DARRYL LLOYD WHITE,

    *Petitioner*,

vs.

DWIGHT WAYNE  NEVEN, *et al.*,

    *Respondents.*

2:05-cv-00608-RLH-GWF

ORDER

16       This habeas matter under 28 U.S.C. § 2254 comes before the Court for a decision on

17 the merits on the remaining claims.  A substantial number of the grounds that remain present

18 claims of ineffective assistance of trial and/or appellate counsel.  Petitioner further has

19 asserted a number of independent substantive claims that the state supreme court rejected

20 on post-conviction review because the claims were not raised on direct appeal.  Petitioner

21 must demonstrate ineffective assistance of appellate counsel in failing to raise these claims

22 in order to establish cause and prejudice to overcome the procedural default of the claims.

23                            ***Background***

24       Petitioner Darryl Lloyd White seeks to set aside his 1999 Nevada state conviction,

25 pursuant to a jury verdict, of attempted murder with use of a deadly weapon and for child

26 abuse and neglect.  He was sentenced to two consecutive terms of 58 to 145 months on the

27 charge of attempted murder with the use of a deadly weapon and a concurrent term of one

28 year on the charge of child abuse and neglect.

The charges arose from domestic violence involving White and his ex-wife, Joya Shelton, on August 2, 1998, at her apartment, where she lived with her four children.  White was the father of at least two of the children.  At trial, the two differed as to whether White was only visiting.  The evidence presented at the August 1999 trial included the following.[1]

Janai White testified as follows.  She was eleven years old at the time of her testimony. She was taking a nap when the sound of a loud bump on the wall woke her up.  She went to see what was happening, and she saw White on top of Shelton choking her.  Shelton pushed White off and ran outside.  White ran to the kitchen, pushing Janai against the wall, and White came back out with a steak knife.  Janai tried to block the door so that White could not follow Shelton outside, but White shoved her into a closet and went outside.[2]

When Janai then went outside, she saw her mother banging on the front door of the apartment of their neighbor, Donna Murray.  Janai saw White striking at Shelton with the knife.  Shelton tried to go down some stairs to get away from White, but the two grappled and then rolled down the stairs.  Janai went to put one of her younger brothers back in the apartment, and when she returned White was on top of Shelton striking at her with the knife and choking her.  Janai kicked the knife from White's hand.  White continued trying to choke Shelton until two men from a neighboring apartment pulled him off of her.[3]

Devon Smith, Shelton's son by a different father, testified as follows.  He was nine years old at the time of the trial.  Smith similarly testified that White and Shelton were fighting, that White got a knife from the kitchen when Shelton ran outside, that he saw his stepfather stabbing at his mother with the knife, and that White was choking Shelton.  He also testified that Janai kicked White and the knife flew out of his hand.  #68-11, Ex. AA, Part 3, at 62-80.

---

[1] The Court makes no credibility findings or other factual findings regarding the truth or falsity of the evidence presented in the state courts, and it summarizes the evidence solely as background to the issue presented in this case.  No statement of fact in describing testimony constitutes a finding of fact or credibility determination by this court.  Further, the Court does not summarize all of the evidence presented in the state courts.  The Court instead summarizes the evidence pertinent to the petitioner's particular claims.

[2] #68-11, Ex. AA, Part 2, at 28-33, 42-48 & 54; #68-12, Ex. AA, Part 3, at 58.

[3] #68-11, Ex. AA, Part 2, at 33-40, 48-55; #68-12, Ex. AA, Part 3, at 56-61.

Neighbor Donna Murray testified that she saw Shelton run out of her apartment with White following her.  Murray ran to her door and saw White on top of Shelton at the bottom of the stairs choking her.  Murray went to get her gun, and her ten-year old son called 911. When Murray came back to her door, she again saw White on top of Shelton at the bottom of the stairs choking her.  Janai was down the stairs at the same level, and Devon was up the stairs.  Murray never saw White with a knife or Janai kick him, but she did not see the entire incident, as she had gone back inside to get her gun.  After the neighborhood men pulled White off of Shelton, Murray told Shelton to go inside her apartment and lock the door. Murray then told White, in an effort to protect Shelton, that if he tried to come up the stairs that she would shoot him.[4]

Neighbor Shonda Carlton's preliminary hearing testimony was read to the jury at trial. She testified as follows.  She heard a commotion outside, and she investigated.  When she went downstairs, she saw White on top of Joya Shelton choking her.  Carlton pleaded with White to stop, but he would not.  Carlton saw a knife laying on the ground about ten to fifteen feet away from White and Shelton.  She picked it up because there were children around. Carlton did not see he knife in White's hands, and she did not see Janai.  After the men pulled White off of Shelton, Carlton helped her up the stairs and back to her own apartment. After the police arrived, Carlton went downstairs, handed the knife to the police, and stated that "this is the knife that Darryl had."[5]

Joya Shelton testified as follows.  She and White got into an argument.  White followed her into her bedroom and began throwing her against the walls and then choking her, saying that he was going to kill her.  White ran toward the kitchen, and, based upon past experiences, Shelton feared that he was going for a knife.  She yelled for her children to leave the apartment, and she ran outside and began knocking on Donna Murray's door.  White followed her outside, however, and he tried to stab her at the top of the stairs, saying that he

---

[4]#68-12, Ex. AA, Part 3, at 81-83; #68-13, Ex. AA, Part 4, at 84-102.

[5]#68-12, Ex. AA, Part 4, at 102-03; #68-5, Ex. T, Part 2, at 37-48.

was going to kill her.  She blocked his hand with the knife and moved as he struck at her, and the blade just missed her jugular vein.  They rolled down the stairs.  White again stabbed at her with the knife, but White again missed and the knife struck the ground.  The knife then came out of White's hand, but Shelton did not see how.  White then began choking her again until the men pulled him off of her.[6]

Shelton further testified that later that evening, the police gave her the knife that White had used in the attack.  She testified that it was the only one of its kind that she had in her knife drawer.  When Detective Laura Anderson came to her house seventeen days later for followup interviews, on or about August 19, 1998, Shelton made the knife available to her.[7]

Detective Anderson testified that she booked the knife obtained from Shelton into evidence.  She testified that police officers were not supposed to return items used as weapons in battery cases to the victims but that it frequently happened.  Detective Anderson additionally testified, *inter alia*, that when she interviewed Janai White, she stated more emphatically than she had testified at trial that White was stabbing at her mother's head and that "if she had not intervened, her mother would most certainly be dead and that he was trying to kill her."[8]

Darryl White testified in the defense case-in-chief as follows.  White acknowledged that he was at the apartment and that he and Shelton got into an argument and then a physical fight.  According to White, the two were in the bedroom snorting lines of powder cocaine that had been sold to Shelton by the neighborhood drug dealer, Donna Murray.  Shelton wanted to borrow a car that White had been using to go to a barbecue without him.  White got angry and hit the plate with the cocaine on it, sending the plate and "the knife" (perhaps used to prepare the lines of cocaine) flying across the room.  They then struggled with the phone, and

---

[6]#69-3, Ex. BB, Part 2, at 52 & 58-61; #69-4, Ex. BB, Part 3, at 62-71 & 82-90; #69-5, Ex. BB, Part 4, at 91-94 & 96-97.

[7]#69-4, Ex. BB, Part 3, at 72-75; #69-5, Ex. BB, Part 4, at 94-97.

[8]#69-2, Ex. BB, Part 1, at 15-16, 18-23; #69-3, Ex. BB, Part 2, at 30-37, 40-41 & 49-50.

Shelton hit White in the mouth with part of the phone. Shelton kept coming at White, who kept pushing her back. Shelton then grabbed the knife, they struggled some more, and Shelton ran out of the bedroom and then out of the apartment.[9]

White acknowledged that he went to the kitchen to get a knife, but he testified that there were no knives in the knife drawer. He further acknowledged that he then followed Shelton outside and grappled with her again. He denied having a knife in his hand.[10]

White acknowledged that after he and Shelton tumbled to the bottom of the stairs, he began choking her. He acknowledged that Shelton was saying to him "Darryl, don't kill me; don't kill me." He testified that he responded: "I kill you, kill you, and then I was saying how many years do we got to go through this s—?" White denied that he was trying to kill Shelton, but his testimony acknowledged that he was "pissed" at Shelton, that he was not in his regular state of mind, and that he "was like tripping a little bit." White further acknowledged that he continued choking Shelton until he was pulled off of her.[11]

White acknowledged that he had been arrested on two prior occasions on domestic violence charges based upon his attacking Shelton. One arrest involved allegations that he kicked the then-pregnant Shelton, although White denied the allegations. White further acknowledged having told Shelton that if she cheated on him, she would "end up like Nicole," referring to O.J. Simpson and Nicole Simpson.[12]

White also acknowledged that he then was in prison at the time of the trial because he had been convicted of possession of a stolen vehicle.[13]

The defense also presented testimony by Wayne Wike. He testified that he saw White late that evening. According to Wike, White's lip was swollen considerably, he was bleeding,

---

[9]#69-5, Ex. BB, Part 4, at 113-18; #69-6, Ex. BB, Part 5, at 127.

[10]#69-5, Ex. BB, Part 4, at 118-19; #69-6, Ex. BB, Part 5, at 136.

[11]#69-5, Ex. BB, Part 4, at 119-20; #69-6, Ex. BB, Part 5, at 121, 125-26, 129, 138 & 140.

[12]#69-6, Ex. BB, Part 5, at 122-25, 129-134 & 139.

[13]#69-5, Ex. BB, Part 4, at 106; #69-6, Ex. BB, Part 5, at 127-28.

-5-

1    and his mouth was full of blood.  White was not present at the vicinity of Shelton's apartment

2    when the incident occurred.[14]

3                                    ***Governing Law***

4           The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly

5    deferential standard for evaluating state-court rulings."  *Lindh v. Murphy*, 117 S.Ct. 2059,

6    2066 n.7(1997).  Under this deferential standard of review, a federal court may not grant

7    habeas relief merely on the basis that a state court decision was incorrect or erroneous.  *E.g.,*

8    *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003).  Instead, under 28 U.S.C. § 2254(d),

9    the federal court may grant habeas relief only if the decision: (1) was either contrary to or

10   involved an unreasonable application of clearly established law as determined by the United

11   States Supreme Court; or (2) was based on an unreasonable determination of the facts in

12   light of the evidence presented at the state court proceeding.  *E.g.*, *Mitchell v. Esparza*, 540

13   U.S. 12, 15, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003).

14          A state court decision is "contrary to" law clearly established by the Supreme Court only

15   if it applies a rule that contradicts the governing law set forth in Supreme Court case law or

16   if the decision confronts a set of facts that are materially indistinguishable from a Supreme

17   Court decision and nevertheless arrives at a different result.  *E.g., Mitchell,* 540 U.S. at 15-16,

18   124 S.Ct. at 10.  A state court decision is not contrary to established federal law merely

19   because it does not cite the Supreme Court's opinions.  *Id.*  Indeed, the Supreme Court has

20   held that a state court need not even be aware of its precedents, so long as neither the

21   reasoning nor the result of its decision contradicts them.  *Id.*  Moreover, "[a] federal court may

22   not overrule a state court for simply holding a view different from its own, when the precedent

23   from [the Supreme] Court is, at best, ambiguous."  *Mitchell*, 540 U.S. at 16, 124 S.Ct. at 11.

24   For, at bottom, a decision that does not conflict with the reasoning or holdings of Supreme

25   Court precedent is not contrary to clearly established federal law.

26          */ / / /*

27   _____

28          [14]#69-5, Ex. BB, Part 4, at 102-05.

                                      -6-

1    A state court decision constitutes an "unreasonable application" of clearly established

2  federal law only if it is demonstrated that the court's application of Supreme Court precedent

3  to the facts of the case was not only incorrect but "objectively unreasonable." *E.g., Mitchell*,

4  540 U.S. at 18, 124 S.Ct. at 12; *Davis v. Woodford*, 333 F.3d 982, 990 (9th Cir. 2003).

5    To the extent that the state court's factual findings are challenged intrinsically based

6  upon evidence in the state court record, the "unreasonable determination of fact" clause of

7  Section 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d

8  943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly

9  deferential" to state court factual determinations. *Id*. The governing standard is not satisfied

10 by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973.

11 Rather, the AEDPA requires substantially more deference:

12         . . . . [I]n concluding that a state-court finding is unsupported by
          substantial evidence in the state-court record, it is not enough that
13         we would reverse in similar circumstances if this were an appeal
          from a district court decision. Rather, we must be convinced that
14         an appellate panel, applying the normal standards of appellate
          review, could not reasonably conclude that the finding is
15         supported by the record.

16 *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

17    If the state court factual findings withstand intrinsic review under this deferential

18 standard, they then are clothed in a presumption of correctness under 28 U.S.C. § 2254(e)(1);

19 and they may be overturned based on new evidence offered for the first time in federal court,

20 if other procedural prerequisites are met, only on clear and convincing proof. 393 F.3d at 972.

21    On a claim of ineffective assistance of counsel, the petitioner must satisfy the two-

22 pronged test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674

23 (1984). He must demonstrate that: (1) counsel's performance fell below an objective standard

24 of reasonableness; and (2) counsel's defective performance caused actual prejudice. On the

25 performance prong, the issue is not what counsel might have done differently but rather is

26 whether counsel's decisions were reasonable from his perspective at the time. The reviewing

27 court starts from a strong presumption that counsel's conduct fell within the wide range of

28 reasonable conduct. On the prejudice prong, the petitioner must demonstrate a reasonable

1  probability that, but for counsel's unprofessional errors, the result of the proceeding would
2  have been different.  *E.g., Beardslee v. Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

3      When evaluating claims of ineffective assistance of appellate counsel, the performance
4  and prejudice prongs of the *Strickland* standard partially overlap.  *E.g., Bailey v. Newland*, 263
5  F.3d 1022, 1028-29 (9th Cir. 2001); *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).
6  Effective appellate advocacy requires weeding out weaker issues with less likelihood of
7  success.  The failure to present a weak issue on appeal neither falls below an objective
8  standard of competence nor causes prejudice to the client for the same reason – because the
9  omitted issue has little or no likelihood of success on appeal.  *Id.*

10     The petitioner bears the burden of proving by a preponderance of the evidence that
11 he is entitled to habeas relief.  *Davis*, 333 F.3d at 991.

12                                    ***Discussion***

13 ***Ground 1:  Multiple Alleged Failures of Trial Counsel***

14     In Ground 1 of the federal petition (#4), White alleges that he was denied effective
15 assistance of counsel when his trial counsel allegedly failed to consult with him on his defense
16 strategy; failed to make an adequate pretrial investigation; failed to familiarize herself with the
17 pertinent facts; failed to locate, interview, obtain statements for and subpoena witnesses
18 identified by petitioner; failed to review the State's discovery; failed to make a pretrial
19 investigation other than interviewing petitioner; failed to develop an adequate theory of the
20 defense refuting the State's allegedly false and misleading allegations; failed to locate,
21 interview, obtain statements for and subpoena any of the witnesses who observed the fight
22 between the petitioner and his ex-wife; failed to interview any of the police officers that
23 interviewed the alleged victims and eyewitnesses that observed the fight; and failed to
24 impeach the state witnesses with any prior inconsistent or perjured testimony.  He alleges
25 that, as a consequence of trial counsel's allegedly inadequate pretrial preparation on the
26 case, counsel gave an inadequate extemporaneous opening statement and then asked the
27 jury to find petitioner guilty of assault (*i.e.*, battery) in her closing argument.
28     / / / /

1    The Supreme Court of Nevada rejected a number of the foregoing claims on the

2    following grounds:

3              . . . White argued that his trial counsel was ineffective for:
            failing to consult with him on important defense strategy issues;
4            failing to familiarize herself with the facts of the case; and failing
            to review the State's discovery.  White did not include specific
5            facts to support these claims, however, or adequately articulate
            how he was prejudiced by his counsel's actions.  Consequently,
6            the district court did not err in denying these claims.

7    #11, Ex. P, at 10 (at electronic docketing page 478).

8    The state high court's rejection of the foregoing claims was neither contrary to nor an

9    unreasonable application of *Strickland*.  Under Nevada state post-conviction practice, a

10   petitioner must attach affidavits, records or other evidence supporting the factual allegations

11   of the petition, and he may not present merely an unsubstantiated claim.  *See* N.R.S.

12   34.370(4).  The state supreme court's rejection of the conclusory and unsubstantiated claims

13   presented to the state courts was neither contrary to nor an unreasonable application of

14   clearly established federal law.[15]

15   Further, on *de novo* review, this Court holds that the remaining conclusory laundry list

16   of alleged failures by counsel in federal Ground 1 fails to present sufficiently specific claims

17   for federal habeas relief.  Petitioner did not identify any specific evidence or trial strategy in

18   Ground 1 that was not developed by trial counsel that would have had a reasonable

19   probability of affecting the outcome of the trial.  Petitioner must do more than merely set forth

20   a generic list of alleged failures by counsel, such as, *e.g.*, conclusory allegations only that

21   counsel failed to adequately investigate the case or failed to impeach witnesses with any prior

22   inconsistent or perjured testimony.  While petitioner presents more specifics in his later

23   federal grounds, Ground 1 is devoid of any specifics as to the evidence or strategy that trial

24

25

26   _____

27   [15]Petitioner provided more detail with regard to other claims in state Ground 1 alleging, *e.g.*, that
     counsel failed to develop certain specific evidence.  These more specific claims were addressed by the
     Supreme Court of Nevada in other portions of its decision, and these claims are discussed further by this
28   Court *infra* on petitioner's other federal grounds.

1   counsel allegedly would have developed through more adequate pretrial preparation.[16]  The

2   conclusory claims in Ground 1 therefore fail to present viable claims.[17]  Counsel further clearly

3   was not ineffective, given White's testimony, in arguing for a lesser included battery verdict.

4        Ground 1 therefore does not provide a basis for federal habeas relief.

5   **Ground 2:  Failure to Call Witnesses**

6        In Ground 2, petitioner alleges that he was denied effective assistance of counsel when

7   his trial counsel failed to subpoena and call as witnesses at trial: (a) police officers Sandy

8   Raschke, Richard Lanave, and Jason Darr; (b) Shonda Carlton; (c) Wayne Wike; (d) "all other

9   police officers" present at his arrest; and (e) eyewitnesses who observed the fight between

10  petitioner and his ex-wife.

11       **Ground 2(a)**

12       With regard to the claim under Ground 2(a) concerning the failure to call police officers

13  Raschke, Lanave, and Darr, the Supreme Court of Nevada rejected the claim on the following

14  grounds:

15

16              . . . White claimed that his trial counsel was ineffective for
        failing to interview and subpoena LVMPD Officers Sandy
17       Raschke, Richard Lanave, and Jason Darr. These officers were
        the first to arrive at the scene and White contended that their
18       testimony would have supported his defense that his ex-wife,
        Joya Shelton, and their children were lying about White's use of
19       a knife. Specifically, White contended that these officers would

20  _____

21       [16]The petitioner's blanket incorporation in federal Ground 1 of the supporting facts in his state petition
    and state court supporting memorandum had no effect.  Over and above the fact that petitioner must set forth
    his claims in the Section 2254 petition form itself, neither the state petition nor the state court memorandum was
22  attached with the federal petition.  Under Rule 2(c) of the Rules Governing Section 2254 Cases, a petitioner
    must set forth his federal habeas claims with specificity.  Petitioner's blanket incorporation of his state filings,
23  particularly filings that were not attached with the petition, presented no specific factual allegations supporting
    his federal claims as required by Rule 2(c).

24
         [17]In the federal reply, petitioner presents approximately thirty pages of specific factual argument
25  directed to federal Grounds 1 through 3.  It would appear that the majority, if not all, of this discussion in the
    reply is applicable to the more factually specific claims in federal Grounds 2 and/or 3 and thus is addressed
26  *infra* as to those claims.  To the extent, if any, that the reply seeks to provide factually specific allegations
    solely as to Ground 1 for the first time in the reply that were not included within the federal petition, the new
27  allegations are disregarded.  Under Rule 15 of the Federal Rules of Civil Procedure, the procedure for
    presenting new claims and allegations after the respondents have answered is by seeking leave to amend,
28  not by inserting new allegations for the first time in the federal reply.  Petitioner never sought leave to amend.

1   have testified that White's daughter did not inform police that
2   White had a knife.

3        We conclude that this claim is without merit.  First, we note
    that contrary to White's assertion, Officer Darr did testify during
4   the State's case-in-chief.  Officer Darr testified that although he
    did not see a knife at the scene, White's daughter indicated to
5   him that a knife was used in the crime.  White did not establish
    that Officers Raschke and Lanave would have provided differing
6   testimony.  Even assuming Officers Rashke and Lanave had
    testified that White's daughter did not indicate that White had a
7   knife, in light of the substantial evidence presented against him at
    trial, we conclude that White did not establish that the outcome of
8   his trial would have been different.  As such, White failed to
    demonstrate that his counsel was ineffective in this regard.

9   #11, Ex. P, at 4-5 (at electronic docketing pages 472-73).

10       The Nevada Supreme Court's rejection of this claim was neither contrary to nor an

11  unreasonable application of *Strickland*.

12       As the state high court noted, Officer Darr did in fact testify at trial.  He testified that he

13  spoke with Janai, and he indicated in his report that a knife was used in the crime.[18]

14       Petitioner maintains that the three officers' testimony would have established that Janai

15  gave a statement to the police in which she made no mention either of seeing White attempt

16  to stab Shelton or of her kicking the knife from his hand.  He further maintains that when

17  Detective Anderson interviewed Janai seventeen days later, Anderson suborned perjury by

18  coaching Janai to instead state that White had tried to stab Shelton.

19       The materials that White submitted with his state petition did not unequivocally support

20  this scenario.  White attached a portion of an August 2, 1998, police report that included the

21  following:

22       According to Shelton and her daughter, Janai White, White
    attacked Shelton in the living room by grabbing her around the
23  neck and pulling on her shirt.  Shelton was able to break free and
    ran outside at which time White ran to the kitchen, shoving his
24  daughter, Janai, against the wall and grabbed a kitchen knife.  As
    White ran out of the kitchen, he punched Janai on the back and
25  ran outside after Shelton.  Shelton stated that White attempted to
    stab her with the knife, but there were no witnesses to this fact.
26  Officer Raschke later told me that the knife was found in the lawn

27

28  [18]#68-13, Ex. AA, Part 4, at 110-11.

-11-

across from the apartment and was nowhere near Shelton or White when witnesses observed them fighting outside.

#86-2, Ex. J, Part 1, at handwritten page number 8 (at electronic docketing page 21).

The foregoing does not reflect a verbatim transcript of a statement taken during an interview of Janai alone in which Janai was directly asked whether she saw White try to stab Shelton and stated that she did not. The report instead describes an interview or interviews of "Shelton and her daughter, Janai White." The statement of there being "no witnesses to this fact" potentially refers to witnesses other than Shelton and Janai, *i.e.*, the mother and daughter who were interviewed. In all events, a witness cannot be impeached by an officer's later recollection and summarization of statements in preparing a police report. The police report, again, does not reflect a verbatim transcript of a statement taken during an interview of Janai alone. Moreover, crime victims do not always recall or relate all details of an incident when they first are interviewed. The police report clearly reflects that White – contrary to his trial testimony – grabbed a knife from the kitchen before pursuing Shelton outside.

Nor do the selected portions of Janai's recorded and transcribed statement that White attached with his state petition establish that Detective Anderson suborned perjury by Janai and caused her to testify to something that did not happen.[19]

The Court notes that, during the trial, White interrupted Detective Anderson's testimony and sought to present his arguments premised upon the statement in the police report that no other witnesses saw him attempt to stab Shelton. The trial court sent the jury out and let White speak his piece on the record outside the presence of the jury. After White spoke, defense counsel noted that Detective Anderson had acknowledged on cross-examination that no witnesses other than Shelton and the two children stated that White attempted to stab Shelton. The State objected to anything being read from the police reports because the reports were hearsay, noting that the report was based upon hearsay from an officer or

---

[19]See, e.g., ##86-2, Ex. J, Part 1, at handwritten page 17 (at electronic docketing page 34): #86-5, Ex. J, Part 4, at handwritten page 100 (at electronic docketing page 29). The Court notes that petitioner did not attach the entire transcript of Janai's statement, so the selected portions of the transcript were not presented in context. In all events, the material presented did not establish improper coaching or subornation of perjury.

-12-

1    officers to another officer.  The State further noted that counsel had agreed to bring the

2    testimony as to the lack of other witnesses to the attempted stabbing in through Detective

3    Anderson rather than recalling Officer Darr.  After hearing from both counsel and from White

4    himself, the state trial court stated that the court was not going to allow the police reports to

5    be introduced in evidence.[20]

6          At bottom, petitioner's presentation to the state courts thus fell far short of establishing

7    that, if called, any of the police officers would have testified that Janai made no mention to

8    any of them either of seeing White attempt to stab Shelton or of kicking the knife from his

9    hand.  Officer Darr did not so testify when called, and no affidavits were tendered to the state

10   courts establishing what Raschke and Lanave actually would have testified to if called.

11   Petitioner cannot establish prejudice based upon speculation.  Moreover, even if, *arguendo*,

12   the child did not specifically state these particulars to a police officer at the time of the initial

13   interviews, such an omission would not necessarily establish that her later statements to a

14   detective during a followup interview were false.  Moreover, as the state supreme court

15   observed, substantial evidence was presented against White at trial, such that there was not

16   a reasonable probability that the purported testimony in question would have affected the

17   outcome at trial.  This evidence included the corroborating testimony of Devon Smith that he

18   saw White attempt to stab Shelton and his sister kick the knife from White's hand.

19          The state high court's rejection of this claim therefore was neither contrary to nor an

20   unreasonable application of clearly established federal law.

21          Ground 2(a) does not provide a basis for federal habeas relief.

22              ***Ground 2(b)***

23          With regard to the claim under Ground 2(b) concerning the failure to call Shonda

24   Carlton, the Supreme Court of Nevada rejected the claim on the following grounds:

25                  . . . White contended that his trial counsel was ineffective
26          for failing to locate Shonda Carlton.  Carlton testified at White's

27   _____

28      [20]#69-3, Ex. BB, Part 2, at 41-45.

1    preliminary hearing, but could not be located prior to White's trial
2    and her preliminary hearing testimony was read to the jury.  White
     asserted in his petition that while in prison, he was able to
3    determine Carlton's whereabouts, and his attorney's performance
     was therefore deficient for failing to do so at the time of his trial.

4        We conclude that White did not establish that he was
     prejudiced by his counsel's failure to locate Carlton.  White did
5    not demonstrate that Carlton's expected trial testimony would
     have been sufficiently different from her preliminary hearing
6    testimony, such that the results of his trial would have been
     different if she had been available to testify.  Therefore, we affirm
7    the district court's denial of this claim.

8    #11, Ex. P, at 3 (footnote omitted)(at electronic docketing page 471).

9        The Nevada Supreme Court's rejection of this claim was neither contrary to nor an

10   unreasonable application of *Strickland*.  As discussed in the background section of this order,

11   Carlton's preliminary hearing testimony was read to the jury.  All of the testimony to which

12   petitioner refers in his petition was read to the jury.  The state supreme court's holding that

13   petitioner accordingly did not demonstrate prejudice was neither contrary to nor an

14   unreasonable application of clearly established federal law.

15       ***Ground 2(c)***

16       With regard to the claim under Ground 2(c) concerning the failure to call Wayne Wike,

17   the Supreme Court of Nevada rejected the claim on the following grounds:

18        . . . White argued that his trial counsel was ineffective for
     failing to procure trial testimony from Wayne Wike.  However, the
19   record reveals that Wike testified at White's trial.  Therefore, this
     claim is belied by the record.  To the extent that White contended
20   that his trial counsel should have questioned Wike concerning
     conversations he overheard between Las Vegas Metropolitan
21   Police (LVMPD) Officers and White at the time of White's arrest,
     we conclude that White did not establish that this testimony would
22   have been admissible, or that it would have altered the outcome
     of his trial.  Consequently, the district court did not err in denying
23   this claim.

24   #11, Ex. P, at 4 (citation footnotes omitted)(at electronic docketing page 472).

25       The Nevada Supreme Court's rejection of this claim was neither contrary to nor an

26   unreasonable application of *Strickland*.  White maintained – without any supporting affidavit

27   from Wike – that Wike observed a conversation between White and Officers Raschke and

28   Lanave in which Raschke allegedly stated that Janai stated to her that Janai kicked White in

his side.  White builds from this one alleged statement an argument that the officers therefore necessarily took a statement or statements from Janai, that she did not state to any of the officers at any time during such statement or statements that White tried to stab or kill Shelton, and that Detective Anderson and the prosecution coerced, influenced and coached Janai to falsely testify that White tried to stab Shelton.  Even if, *arguendo*, such testimony – by Wike as to what Wike allegedly heard Officer Raschke say as to what Janai said – would have been admissible, there was not a reasonable probability that admission of the testimony would have altered the outcome at trial.  The alleged statement – that Janai said to Officer Raschke that she kicked White in the side – in and of itself did not establish that Janai did not also state that evening that White tried to stab Shelton, that her later statements to Detective Anderson that White tried to stab Shelton were false, or that the police or prosecution knowingly suborned perjury.  *Inter alia*, nothing that the officers stated or wrote following the incident reflected a verbatim transcript of an interview of Janai that established conclusively what she did and did not say that evening.  Nor did the officer's statements rule out Janai truthfully providing additional information at a later time when interviewed by a detective rather than a patrol officer.  See also Ground 6(a)(4), *infra*.  The state court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law.

Ground 2(c) therefore does not provide a basis for federal habeas relief.

### Ground 2(d)

On *de novo* review, Ground 2(d) fails to present a viable and sufficiently specific claim for federal habeas relief.  Petitioner alleges only that trial counsel was ineffective for failing to call "all other police officers" present at his arrest.  The petition alleges no specifics as to who the officers were or what their testimony would show.  Such a conclusory claim does not provide a basis for federal habeas relief.

### Ground 2(e)

With regard to the claim under Ground 2(e) concerning the failure to call the eyewitnesses who observed the fight between petitioner and his ex-wife, the Supreme Court of Nevada rejected the claim on the following grounds:

1
2
3
4
5
6
7

> . . . White contended that his trial counsel was ineffective for failing to interview or subpoena the following witnesses: Carlton's boyfriend Greg; a woman named Debbie that White's daughter mentioned during her preliminary hearing testimony; "witnesses" that were referenced in a police report; and the various "people up on balconies and people down in the courtyard" mentioned by Officer Darr during his testimony. However, White failed to support this claim with specific facts, such as the expected testimony of these individuals; instead, White merely speculated that they "might have observed the incident." Because White did not adequately support this claim, the district court did not err in denying him relief.

8  #11, Ex. P, at 5 (citation footnotes omitted)(at electronic docketing page 473).

9       The Nevada Supreme Court's rejection of this claim was neither contrary to nor an

10  unreasonable application of *Strickland*.  As noted in the discussion of Ground 1, under

11  Nevada state post-conviction practice, a petitioner must attach affidavits, records or other

12  evidence supporting the factual allegations of the petition, and he may not present merely an

13  unsubstantiated claim.  *See* N.R.S. 34.370(4).  The state supreme court's rejection of the

14  unsubstantiated claim presented in state court was neither contrary to nor an unreasonable

15  application of clearly established federal law.

16       Ground 2(e) does not provide a basis for federal habeas relief.

17       ***Ground 3:  Failure to Obtain Documents to Impeach Witnesses***

18       In Ground 3, petitioner alleges that he was denied effective assistance of counsel when

19  his trial counsel failed to obtain the following documents to impeach the State's witnesses:

20  (a) Joya Shelton's work attendance records for the dates of August 2, 4, and 19, 1998; (b)

21  Janai's birth certificate and school attendance records; (c) his own medical records from the

22  Clark County Detention Center; and (d) his medical records from California from prior alleged

23  incidents.

24       ***Ground 3(a)***

25       Petitioner alleges that trial counsel should have obtained Joya Shelton's work

26  attendance records for the dates of August 2, 4, and 19, 1998, to establish that she was lying

27  when she testified that she worked on the date of the incident and on the date that Detective

28  Anderson interviewed Janai.

The Supreme Court of Nevada rejected the claim on the following grounds:

> . . . White claimed that his trial counsel was ineffective for failing to obtain Shelton's employment records.  White argued that although Shelton testified that she had worked the day of the incident, as well as the day Detective Laura Anderson came to her apartment, she had not.  White asserted that Shelton's employment records would have verified this.  However, assuming Shelton did not work these days, White failed to demonstrate that the outcome of his trial would have been different if this information had been presented to the jury.  Because White did not establish that he was prejudiced by his counsel's actions, we affirm the district court's denial of this claim.

#11, Ex. P, at 5-6 (at electronic docketing pages 474-75).

The Nevada Supreme Court's rejection of this claim was neither contrary to nor an unreasonable application of *Strickland*.  It was not objectively unreasonable for the state supreme court to conclude that the petitioner could not demonstrate prejudice.  There was not a reasonable probability that the outcome of the trial would have been different if Joya Shelton had been successfully impeached – if the inquiry were permitted by the trial court in the first instance – on the collateral point as to whether she correctly recalled whether she had worked on the days in question.  Moreover, White's claim was wholly unsubstantiated and speculative as to what Shelton's employment records in fact would have shown.  White asserts that Shelton did not work those particular days (and he would not have been present himself on August 19, 1998), but White's recollection and/or bald assertions do not establish what the employment records in fact would have established.

Ground 3(a) therefore does not provide a basis for federal habeas relief.

### Ground 3(b)

Petitioner alleges that trial counsel should have obtained Janai's birth certificate and school attendance records to establish that she falsely testified that her name was Janai White – "to pawn" [sic] her off as his blood daughter who would not falsely testify against her father –  and also to confirm if she attended school on August 4, 1998.

The Supreme Court of Nevada rejected the claim on the following grounds:

> . . . White alleged that his trial counsel was ineffective for failing to obtain his daughter's birth certificate and school attendance records.  White contended that his daughter lied

-17-

1
2
3

about her name and whether she attended school on August 4, 1998. White did not establish that these documents would have cast doubt on his daughter's credibility, such that the outcome of his trial would have been different.[FN13] Accordingly, the district court did not err in denying this claim.

4
5

[FN13] We note that during White's preliminary hearing, his daughter testified that she uses two different last names.

6  #11, Ex. P, at 6 (at electronic docketing page 474).

7       The state high court's decision was neither contrary to nor an unreasonable application

8  of *Strickland*.  It was not objectively unreasonable for the court to conclude that White could

9  not demonstrate prejudice on the unsubstantiated claim.  Despite questions – from both

10  counsel – at trial referring to Janai as his daughter, White never responded that Janai was

11  not his daughter in his testimony.[21]  White's contrary claim after the fact that a birth certificate

12  would show that Janai was not his daughter was a bald assertion that was unsubstantiated

13  by any competent evidence tendered with the state petition.  White's bald post-trial denial of

14  paternity did not establish lack of paternity.  Again, under Nevada state post-conviction

15  practice, a petitioner must attach affidavits, records or other evidence supporting the factual

16  allegations of the petition, and he may not present merely an unsubstantiated claim.  *See*

17  N.R.S. 34.370(4).  White's further claim as to what the school records would show similarly

18  was wholly unsubstantiated and pertained to a time when he was not present.  There further

19  was not a reasonable probability that the outcome of his trial would have been different if the

20  child had been successfully impeached – if the inquiry were permitted by the trial court in the

21  first instance – on the collateral point as to whether she was at school on a particular day.

22  Indeed, while White maintains that it was "paramount" to confirm if Janai attended school on

23  August 4, 1998, he provides no explanation as to why the point was even a material one.[22]

24       Ground 3(b) therefore does not provide a basis for federal habeas relief.

25

26

27  [21]#69-6, Ex.BB, Part 5 at 121, 137 & 139; see also #69-5, Ex. BB, Part 4, at118 (White testifies: "I heard [Joya Shelton] tell Janai your dad's trying to kill your mom.").

28  [22]She did not testify at trial that she was or was not in school that day, two days after the incident.

-18-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### Ground 3(c)

White alleges that trial counsel should have obtained his medical records from the Clark County Detention Center to establish that Joya Shelton struck him in the mouth with a telephone – both to support his theory of the defense that the fight started when Shelton struck him in the mouth with the phone and also to impeach the arresting police officer.

The Supreme Court of Nevada rejected the claim on the following grounds:

> . . . White claimed that his trial counsel was ineffective for failing to obtain his medical records from the Clark County Detention Center (CCDC). White contended that Shelton struck him in the mouth with a phone the day of the incident, and medical records from the CCDC would have corroborated this. However, the record reveals that defense witness Wike testified that White was injured after the incident. White did not establish that additional evidence concerning his injuries would have altered the outcome of his trial. Therefore, White failed to demonstrate that his counsel was ineffective, and we affirm the order of the district court in this respect.

#11, Ex. P, at 6-7 (at electronic docketing pages 474-75).

The Nevada Supreme Court's rejection of this claim was neither contrary to nor an unreasonable application of *Strickland*. It was not objectively unreasonable for the state supreme court to conclude that the petitioner could not demonstrate prejudice. Shelton testified that she struck White somewhere in the face after neighbors pulled him off of her.[23] White testified that she hit him in the mouth with the phone inside the apartment.[24] Medical records showing an injury would do nothing to establish which one was telling the truth, as the records would establish only the existence and not the cause of the injury. Moreover, and more to the point, how the fight started was irrelevant. Even if Shelton, *arguendo*, started the fight by hitting White in the mouth with a phone, the charges against White were based upon what he did after the fight started. Being hit in the mouth with a phone by someone who then runs away does not excuse chasing after the person and attempting to kill them by trying to stab and choke them. There thus was not a reasonable probability that introducing the

_____

[23]#69-4, Ex. BB, Part 3, at 68-69; #69-5, Ex. BB, Part 4, at 94.

[24]#69-5, Ex. BB, Part 4, at 117.

1    medical records would change the outcome of the trial -- even, *arguendo*, in the highly unlikely

2    event that the jail medical records in fact could establish that Shelton struck White in the

3    mouth with a phone before he attacked her.

4        Moreover, impeaching the arresting police officer's testimony would have had

5    absolutely no impact on the outcome of the trial.  Officer Al Woodruff simply was a bicycle

6    patrol officer that responded to a radio dispatch and took White into custody at Wike's

7    apartment.  He testified, on cross-examination, that he did not notice any injuries on White.[25]

8    This testimony as to what was noticed by an arresting officer would not necessarily be

9    impeached by the results of a later medical examination by a health care professional.

10    However, even if Officer Woodruff's testimony, *arguendo*, would have been "impeached" by

11    the results of a later medical examination, the officer testified only that he took White into

12    custody in response to a dispatch and that he himself observed no injuries.  "Impeaching" this

13    testimony would have had nil impact on the outcome at trial.

14        Ground 3(c) therefore does not provide a basis for federal habeas relief.

15        **Ground 3(d)**

16        Petitioner alleges that trial counsel should have obtained his medical records from

17    California to establish that Joya Shelton attacked him with a steak knife in 1994 and 1995,

18    to corroborate the alleged fact that Shelton had a history of using a steak knife in domestic

19    quarrels with White.

20        The Supreme Court of Nevada rejected the claim on the following grounds:

21

22            . . . White argued that his trial counsel was ineffective for
      failing to obtain his medical records from California.  White

23       contended that once in 1994 and once again in 1995, Shelton cut
      him with a steak knife and he required medical attention.  White

24       asserted that this evidence would have bolstered his defense that
      Shelton was threatening him with the knife, not the reverse.  We

25       conclude that White failed to establish that he would not have
      been convicted of attempted murder with the use of a deadly

26       weapon if his counsel had procured these alleged records.  There
      was substantial evidence presented against White at trial –

27

28      [25]#68-13, Ex. AA, Part 4, at 111; #68-14, Ex. AA, Part 5, at 112-16.

1
2

> Shelton and two of her children all provided testimony that White
> retrieved a steak knife from the kitchen and threatened Shelton.
> As such, we affirm the district court's denial of this claim.

3    #11, Ex. P, at 6-7 (at electronic docketing pages 474-75).

4        The Nevada Supreme Court's rejection of this claim was neither contrary to nor an

5    unreasonable application of *Strickland*.  It was not objectively unreasonable for the state

6    supreme court to conclude that the petitioner could not demonstrate prejudice.  *Inter alia,*

7    there was not a reasonable probability that the California medical records – which were not

8    tendered with the state petition – would establish who caused the alleged injuries in 1994 and

9    1995.

10       Ground 3(d) therefore does not provide a basis for federal habeas relief.

11       ***Ground 4:  Failure to Move in Limine to Suppress the Knife***

12       In Ground 4, petitioner alleges that he was denied effective assistance of counsel when

13   his trial counsel failed to file a motion in limine seeking to suppress the knife on the basis that

14   it was fraudulent evidence.  White maintains that the knife received in evidence, allegedly a

15   black-handled butcher knife, did not match a description of the knife that was impounded,

16   allegedly a brown-handled steak knife.

17       The Supreme Court of Nevada rejected the claim on the following grounds:

18
19
20
21
22

> . . . White contended that his trial counsel was ineffective
> for failing to file a motion in limine to suppress the admission of
> the knife allegedly used in the crime.  However, a review of the
> record reveals that trial counsel strenuously objected to the
> admission of the knife, but the district court overruled the
> objection.  We therefore conclude that White did not establish
> that he was prejudiced by his counsel's failure to file a motion in
> limine, and the district court did not err in denying the claim.

23   #11, Ex. P, at 7 (at electronic docketing page 475).

24       The Nevada Supreme Court's rejection of this claim was neither contrary to nor an

25   unreasonable application of *Strickland*.

26       White's argument that the knife introduced at trial was fraudulent evidence and not the

27   knife impounded into evidence is based upon the following purported logic.  First, the knife

28   impounded by Detective Anderson into evidence was described in the property report as a

-21-

brown-handled steak knife with a serrated edge.[26]   Second, the two children, Janai and Devon, testified that the knife that they recalled seeing at the time of the incident had a black handle, therefore the knife introduced at trial had a black handle rather than a brown handle.[27] Third, the prosecutor, at the sentencing three months after the trial, described the knife as a butcher knife, therefore the knife introduced at trial was a butcher knife rather than a steak knife.[28]   Thus, according to White's logic, the knife introduced at trial was a black-handled butcher knife rather than the brown-handled steak knife impounded into evidence by Detective Anderson, such that the knife introduced at trial was fraudulent evidence.

Petitioner's logic is flawed.

The testimony of the children did not establish the color of the handle of the knife that was introduced at trial.  Neither child was presented during their testimony with the exhibit introduced at trial.  Their testimony established only their best recollection of the color of the knife handle from the incident a year prior to trial, not the color of the handle of the knife introduced into evidence later through the testimony of Joya Shelton and Detective Anderson.

Nor did the prosecutor's use of the phrase "butcher knife" in describing the knife at sentencing three months after trial establish that the knife introduced at trial was a different knife from the steak knife impounded into evidence.  White acknowledges that the statements of lawyers are not evidence, but he maintains that the prosecutor's use of the phrase constitutes a binding admission by the attorney.  This position is frivolous.  The terminology used by the prosecutor three months after the fact in no sense established or constituted a binding admission as to what evidence actually was introduced at trial.  Moreover, as importantly, the prosecutor's terminology in describing the evidence three months after trial cannot establish what trial counsel should have done with regard to the actual evidence prior

---

[26]#86-3, Ex. J, Part 2, at handwritten page number 29 (at electronic docketing page 14).

[27]#68-11, Ex. AA, Part 2, at 55 (Janai); #68-12, Ex. AA, Part 3, at 77 (Devon).  Devon testified only that "I think the handle was black."

[28]#69-8, Ex. DD, at 5.

1    to and at trial.  Counsel's actions prior to and at trial necessarily would be based upon the

2    evidence presented at trial, not upon a statement made three months after trial about the

3    evidence.

4         Petitioner's argument that the knife introduced at trial was fraudulent evidence

5    therefore is based on flawed logic.

6         The trial record instead reflected the following.  Shonda Carlton testified that she

7    picked up a knife from about ten to fifteen feet away from where Shelton and White were at

8    the bottom of the stairs.  She gave the knife to the police, stating that "this is the knife that

9    Darryl had."  Joya Shelton testified that the police later gave her the knife.  Detective

10   Anderson testified that this was not proper procedure but happened frequently in battery

11   cases.  Shelton then made the knife available to Detective Anderson on or about August 19,

12   1998.  Shelton testified that the knife introduced at trial was the knife that she provided to

13   Detective Anderson, and Anderson testified that the knife introduced at trial was the knife that

14   was provided to her by Shelton.  Defense counsel strenuously objected to the introduction of

15   the evidence for lack of an adequate chain of custody, but the state trial court overruled the

16   objection, on the basis that the break in the chain of custody went to the weight.[29]

17        In light of the trial record as well as the flawed logic undergirding White's claim, the

18   Nevada Supreme Court's conclusion that petitioner could not demonstrate prejudice based

19

20   _____

21   [29]#68-12, Ex. AA, Part 4, at 102-03 (reading of Shonda Carlton testimony at trial); #68-5, Ex. T, Part 2 at 40-41 & 46 (Shonda Carlton); #69-4, Ex. BB, Part 3, at 72-75 (Joya Shelton); #69-5, Ex. BB, Part 4, at 94-97 (Shelton); #69-2, Ex. BB, Part 1, at 18-23 (Anderson); #69-3, Ex. BB, Part 2, at 32-35, 40-41 & 49-50 (Anderson); #69-2, Ex. BB, Part 1, at 10-13 (argument); #69-4, Ex. BB, Part 3, at 74-75 (argument and final ruling).

23

24   Petitioner further points repeatedly to a statement in an August 4, 1998, report by Detective Anderson that the knife could not be found.  See #86-3, Ex. J, Part 2, at handwritten page number 27 (at electronic

25   docketing page 12).  This statement is fully consistent with the above testimony and with what Detective Anderson potentially individually would have known two days after the incident – between the time that police officers gave the knife to Shelton on August 2, 1998, and the time that Anderson obtained the knife

26   seventeen days later on August 19, 1998.  Moreover, White's reliance on the August 4, 1998, statement that the knife could not then be found entirely begs the question as to the claim that he presents in Ground 4.

27   Petitioner's claim is that the knife impounded on or after August 19, 1998 was not the same knife as the knife introduced at trial.  Whether the knife could be found fifteen days earlier on August 4, 1998, has nothing to do

28   with what allegedly happened to the impounded knife between August 19, 1998, and the trial a year later.

-23-

1  upon trial counsel's failure to file a motion in limine arguing that the knife was fraudulent

2  evidence was neither contrary to nor an unreasonable application of clearly established

3  federal law.  The state court record did not reflect that there was a reasonable probability

4  either that a motion in limine would have been successful or that the outcome of the trial

5  would have been affected by the filing of the motion.

6       Ground 4 does not provide a basis for federal habeas relief.[30]

7  **Ground 5(a): Trial Court's Admission of Prior Bad Act Evidence**

8       In Ground 5(a), petitioner alleges that he was denied rights to a fair trial and due

9  process of law when the trial court admitted prior bad act evidence consisting of evidence of

10  prior domestic violence incidents wherein White committed a battery on Shelton as well as

11  of his statement to her that she would end up like Nicole, *i.e.*, like Nicole Simpson.[31]

12       Counsel raised a claim on direct appeal that the state trial court violated N.R.S.

13  48.045(2) when it allowed prior bad act evidence.  In his state post-conviction petition, White

14  sought to federalize this claim by including allegations that the admission of the evidence

15  violated federal constitutional rights to a fair trial and due process of law.  The state district

16  court held that White's "allegation of constitutional error in ground 5 is barred by the doctrine

17  of law of the case."  The Supreme Court of Nevada affirmed this district court holding, noting

18  that the law of the case doctrine could not be avoided by a more detailed and precisely

19  focused argument, relying upon *Hall v. State*, 91 Nev. 314, 315, 535 P.2d 797, 798 (1975).

20       The Nevada Supreme Court's application of the Nevada law of the case doctrine in this

21  case thus constituted a bar to the presentation of new legal claims based upon the same facts

22  rather than a mere relitigation bar applied to previously-adjudicated legal claims.  This Court

23

24       [30]In the federal reply, petitioner further seeks to expand Ground 4 to include a claim that trial counsel

25  was ineffective for failing to argue that the knife was not a dangerous weapon.  While allegations regarding whether the knife was a dangerous weapon may have been asserted as to other claims, neither federal

26  Ground 4 nor the corresponding ineffective assistance claim in the state court included any such allegation or claim.  As noted previously under Ground 1, petitioner may not amend the federal petition simply by adding

27  new claims in the reply after the respondents have answered.  See note 17, *supra*.

28       [31]See text, *supra*, at 5, lines 14-18.

accordingly held that Ground 5(a) was barred under the federal procedural default doctrine unless the petitioner could demonstrate ineffective assistance of appellate counsel in failing to raise the barred federal constitutional claims now presented in federal Ground 5(a).[32]

As the Court noted in its prior order, petitioner's claim of cause and prejudice based upon ineffective assistance of appellate counsel stands on a weak footing. White did not present a claim of ineffective assistance of appellate counsel in the state courts premised specifically upon the failure to raise the constitutional claims in Ground 5(a). The closest claim presented was a general claim that appellate counsel failed to communicate with him.

In any event, this Court is not persuaded that petitioner has established that appellate counsel was ineffective for failing to raise the federal constitutional claims in federal Ground 5(a) on direct appeal.

The state trial court held a *Petrocelli* [33] hearing prior to trial regarding the admissibility of the evidence. The court held that the State could introduce in its case-in-chief the prior statement by White referring to Joya Shelton possibly winding up like Nicole Simpson. The court held that the State could not introduce the prior incidents of domestic violence, however, unless White opened the door to admission of the evidence by putting in character evidence seeking to establish, *e.g.*, that he had no history of violence.[34]

At trial, however, White gave rambling extemporaneous answers to questions on other topics by defense counsel where White's answers implied that there had been prior incidents between himself and Shelton. For example, when defense counsel asked White why he was choking Shelton, he responded, *inter alia*, "[a]nd I was just choking her, and I was like how many years we got to go – because we always go through this type of thing."[35] It appears that defense counsel thereupon inquired as to the specific incidents in an effort to lessen the

---

[32]See #52, at 13-15.

[33]See *Petrocelli v. State*, 101 Nev. 46, 692 P.2d 503 (1985).

[34]#68-8, Ex. Y, at 30-31 & 33; see also *id.*, at 4-29 (testimony and argument).

[35]#69-5, Ex. BB, Part 4, at 120, lines 20-24; see also *id.*, at lines 1-8.

-25-

1    impact of the evidence, after White himself opened the door, by questioning White about the

2    specifics prior to the State's cross-examination.[36]

3        Thereafter, on direct appeal, the state high court rejected the claim that the introduction

4    of the evidence violated state law, because the threat was relevant evidence of intent and

5    because the defense rather than the State had presented the evidence of the prior incidents.[37]

6        This Court is not persuaded that there was a reasonable probability that there would

7    have been a different outcome on direct appeal if appellate counsel had additionally argued

8    that the introduction of the violated federal constitutional rights to a fair trial and due process.

9    First, there is no federal constitutional authority barring the introduction of a prior threat made

10   by the defendant to an attempted murder victim when offered as evidence of intent.  Second,

11   as noted by the state supreme court on the state law claims, the defense rather than the State

12   introduced the prior incident evidence, albeit apparently as a tactical decision prompted by

13   White's own overly loquacious extemporizing in responding to his counsel's questions.

14   Second, the admission of prior bad act evidence, in and of itself, does not necessarily violate

15   a defendant's right to a fair trial or to due process.  *See Estelle v. McGuire*, 502 U.S. 62, 75

16   n.5, 112 S.Ct. 475, 484 n.5, 116 L.Ed.2d 385 (1991).  Petitioner has presented no apposite

17   authority establishing that -- even if the prior incident evidence had been introduced by the

18   State rather than the defense -- the introduction of the evidence would have violated the

19   federal constitution in the circumstances presented in his case.  Appellate counsel was not

20   ineffective for failing to communicate with petitioner regarding, or failing to raise, the federal

21   constitutional claims because the claims had little or no chance of success, especially given

22   that the defense rather than the State introduced the prior incident evidence.

23       Petitioner therefore cannot establish cause and prejudice based upon ineffective

24   assistance of appellate counsel in order to excuse the procedural default of Ground 5(a).

25       Ground 5(a) therefore is barred by procedural default.

26   _____

27   [36]#69-6, Ex. BB, Part 5, at 122-26.

28   [37]#11, Ex. F, at 3-5.

***Ground 5(b): Trial Counsel's Inquiry as to the Prior Bad Acts***

In Ground 5(b), petitioner alleges that he was denied effective assistance of counsel when his trial counsel inquired as to the prior bad act evidence discussed above under Ground 5(a). Petitioner maintains that defense counsel inquired as to the prior incidents of domestic violence in order to punish him for deciding to take the stand.

The Supreme Court of Nevada rejected the claim on the following grounds:

> . . . White claimed that his trial counsel was ineffective for questioning him during trial about a 1996 incident in which he allegedly kicked Shelton in the stomach while she was pregnant. White argued that his attorney asked him about this incident to punish him for testifying on this own behalf. We conclude that White is not entitled to relief on this claim. Prior to trial, the district court ruled that the State could question White about the 1996 incident in the event he testified. Trial counsel's attempt to lessen the impact of this evidence by questioning White about it prior to the State doing so was a reasonable tactical choice, and as such, was entitled to deference. Consequently, White failed to demonstrate that his counsel was ineffective in this regard.

#11, Ex. P, at 7-8 (at electronic docketing pages 475-76).

This Court is persuaded by the petitioner's argument that the Nevada Supreme Court's decision on this claim was based upon an unreasonable determination of fact in light of the state court record. As discussed above under Ground 5(a), the state district court clearly did not hold that the evidence – other than White's reference to Nicole Simpson – was admissible merely if White testified. The state district court instead ruled that the State could introduce the evidence in its rebuttal if White sought to put on character evidence that he was a good or nonviolent person. The state supreme court's decision rejecting the ineffective assistance claim therefore was based upon an unreasonable determination of fact.

On *de novo* review, however, this Court is not persuaded that trial counsel was ineffective for addressing the prior incidents after White's own rambling extemporaneous responses to defense counsel's questions alluded to prior incidents. The apparent tactical decision to at least lessen the impact of the evidence was not an unreasonable one, given the limited options available to counsel after White opened the door to the evidence by alluding to there having been prior incidents. See text, *supra*, at 25-26.

-27-

1    Ground 5(b) therefore does not provide a basis for federal habeas relief.

2        **Ground 6:  Failure to Impeach Witnesses with Prior Inconsistent Statements**

3        In Ground 6, petitioner alleges that he was denied effective assistance of counsel when

4    his trial counsel failed to impeach the State's witnesses with prior inconsistent statements,

5    specifically as to: (a) the child Janai; (b) Joya Shelton; and (c) Detective Anderson.

6            **Ground 6(a)**

7        Petitioner contends that trial counsel was ineffective for failing to impeach Jania with:

8    (1) preliminary hearing testimony that she could not describe the knife, in contrast to her trial

9    testimony that the knife was a black-handled steak knife; (2) testimony that she did not know

10   where White was aiming the knife at the bottom of the stairs, in contrast to her testimony that

11   White was aiming the knife at Shelton's face; (3) a statement to Detective Anderson that

12   White was trying to kill Shelton, in contrast to trial testimony that she did not think that White

13   was trying to kill Shelton; (4) a recantation as to whether she kicked the knife out of White's

14   hand, in contrast to trial testimony that she kicked the knife out of his hand; (5) alleged

15   testimony by Officer Darr that he took not only a statement but "a report" from Janai, in

16   contrast to her preliminary hearing and trial testimony that she did not give a statement to the

17   police on the day of the incident; and (6) statements to Detective Anderson that, when White

18   and Shelton were at the top of the staircase, White tried to stab her three or four times, in

19   contrast to testimony at the preliminary hearing and trial that she really did not see White try

20   to stab Shelton and that she did not remember that part of the incident.

21       The Supreme Court of Nevada rejected the claim presented to that court on the

22   following grounds:

23                    . . . White argued that his trial counsel was ineffective for
             failing to adequately impeach his daughter.  Specifically, White
24           alleged that his counsel should have questioned her about
             several inconsistencies among her statement to Detective
25           Anderson, preliminary hearing testimony, and trial testimony. We
             have reviewed the various areas in which White contended that
26           his trial counsel should have impeached his daughter, and
             conclude that he did not demonstrate that his counsel was
27           ineffective.  The alleged inconsistencies are relatively minor in
             light of the considerable evidence presented against him at trial.
28           We further note that trial counsel conducted a vigorous cross-

1
2
> examination of White's daughter.  We therefore conclude that
> White failed to establish that he was prejudiced by his counsel's
> actions, and the district court did not err in denying this claim.

3    #11, Ex. P, at 9 (at electronic docketing pages 477).

4         The state high court's rejection of this claim was neither contrary to nor an

5    unreasonable application of *Strickland*.

6         With regard to item (1) above, White's assertion that Janai testified at the preliminary

7    hearing that she could not describe the knife overstates the case.  Janai stated from the very

8    beginning of her preliminary hearing testimony that the knife was a steak knife.  She later was

9    asked a series of questions about the knife on cross-examination.  She initially said "no" when

10   asked a vague, open-ended question as to whether she could "describe the knife."  She then,

11   in response to the very next question, which was more specific, once again described the

12   knife as a steak knife.  Janai never was asked the color of the handle of the knife during the

13   preliminary hearing.[38]  Her preliminary hearing testimony therefore was not inconsistent with

14   her trial testimony, and an attempt to impeach Janai's trial testimony with the preliminary

15   hearing testimony would have had little if any impact, because the alleged "inconsistency" was

16   strained at best.  There was not a reasonable, or really any, probability that an attempt to

17   "impeach" Janai's trial testimony that the knife was a black-handled steak knife with her

18   preliminary hearing testimony would have produced a different outcome at trial.

19        With regard to item (2) above, petitioner maintains that trial counsel should have

20   impeached Janai's testimony as follows:

21
22
23
> Janai testified that she **did not** know where Mr. White was
> aiming the alleged knife when he and Ms. Shelton was [sic]
> struggling at the bottom of the stairs.  Then she testified that Mr.
> White was aiming the knife at Ms. Shelton's face.  Hatcher did not
> impeach Janai with these prior inconsistent statements.

24   #4, at 13 (emphasis in original).  Petitioner again overstates and/or misstates the case.  At

25   the preliminary hearing, Janai was asked where White was aiming the knife, and she

26   responded "[in] her face."  When then asked "[w]as the knife pointing in her face?," she stated

27   _____

28        [38]#68-4, Ex. T, at 12 & 25.

-29-

1   "I really don't remember."  She then demonstrated a stabbing or jabbing movement by lifting

2   her arm up and then down.[39]  If petitioner is suggesting that Janai's preliminary hearing

3   testimony was internally inconsistent, any such inconsistency was too tenuous to provide a

4   basis for effective impeachment.  She testified that White was aiming for Shelton's face but

5   that she could not remember whether the knife itself was pointing at her face.  To clarify her

6   testimony, she then demonstrated what she saw White do with the knife in his hand.  There

7   was not a reasonable, or again really any, probability that an attempt to "impeach" Janai's trial

8   testimony that this preliminary hearing testimony – which was not inconsistent in material

9   substance with her trial testimony[40] – would have produced a different outcome at trial.

10          Petitioner's reliance on item (3) is problematic for a number of substantial reasons.

11  Petitioner maintains in item (3) that trial counsel should have used Janai's statement to

12  Detective Anderson that White was trying to kill Shelton to impeach alleged testimony that she

13  did not think that White was trying to kill Shelton.  First, Janai did not testify on direct at trial

14  that she did not think that White was trying to kill Shelton.  It would have been problematic for

15  defense counsel to seek to use an alleged prior inconsistent statement for impeachment

16  where there was no statement in the direct trial testimony to impeach.  Second, even more

17  to the point, defense counsel then would have been impeaching the witness with a prior

18  statement that was more inculpatory than her trial testimony on direct, which generally is not

19  a strategy that produces a net positive outcome for the defense.[41]  Third, in all events, the

20  prosecution presented testimony as to Janai's prior statements to Detective Anderson, both

21

22          [39]#68-4, Ex. T, at 14.

23          [40]See #68-11, Ex. AA, Part 2, at 35-36.  While Janai's recollection as to where exactly the knife was
    pointing varied slightly over time, she consistently testified that White struck at Shelton with the knife when
24  they were at the bottom of the stairs.  There was not a reasonable probability that White would secure a
    different outcome based upon, *e.g.*, any uncertainty by Janai as to whether White was aiming for Shelton's
25  face or instead her shoulder.  She testified – and physically demonstrated – at both the preliminary hearing
    and trial that White was bringing the knife down in a stabbing motion at Shelton.

26          [41]White's argument that the alleged inconsistencies establish perjury is discussed further, *infra*, as to
27  Ground 10.  It suffices here to point out, first, that inconsistency, in and of itself, does not establish perjury
    and, second, that a defense strategy of seeking to demonstrate perjury by bringing out even more inculpatory
28  prior testimony by the witness generally has a low to nonexistent probability of success.

during redirect examination of Janai as well as during Anderson's testimony.[42]   The very testimony that petitioner urges should have been presented to the jury thus in fact was presented to the jury.  On redirect, Janai ultimately testified: "I thought he was [trying to kill her].  I didn't know if he was or if he wasn't, but I thought."[43]  Petitioner therefore clearly cannot demonstrate prejudice in this regard, given, *inter alia*, that the very statements that he maintains should have been presented in fact were presented to the jury.

With regard to item (4) petitioner maintains that Janai recanted testimony that she kicked the knife out of White's hand, in contrast to trial testimony that she kicked the knife out of his hand.  Petitioner again appears to overstate the case.  Janai, over the course of her preliminary hearing testimony, was not absolutely certain that her kick hit White's hand as opposed to some other body part, but she consistently testified throughout her preliminary hearing testimony that she kicked White and the knife then flew from his hand.[44]  Her trial testimony was substantially in accord with this preliminary hearing testimony, with Janai, once again, testifying that she kicked the knife from White's hand but not being certain as to exactly where her kick hit White.[45]   There was not a reasonable, or in truth any, probability that seeking to impeach Janai's trial testimony in this regard would have resulted in a different outcome at trial.

With regard to item (5), petitioner maintains that Officer Darr testified that he took not only a statement but "a report" from Janai, in contrast to her preliminary hearing and trial testimony that she did not give a statement to the police on the day of the incident.  Officer Darr testified in pertinent part that he spoke with Janai on the evening of the incident and that

---

[42]#68-12, Ex. AA, Part 3, at 59-61 (Janai); #69-2, Ex. BB, Part 1, at 15-16 (Detective Anderson).  The fact that the prosecution brought out the statements – in response to testimony that defense counsel elicited on cross-examination of Janai – tends to reinforce the point that the statements provided more grist for the State's mill than for that of the defense.

[43]#68-12, Ex. AA, Part 3, at 61.

[44]#68-4, Ex. T, at 13-14, 24-30 & 36.

[45]#68-11, Ex. AA, Part 2, at 35, 37 & 54-55.

he did "the report" for her, as distinguished from "the reports" of other officers who spoke with other persons.[46] Janai testified at trial that the police asked whether she was injured and she told them that her back hurt but that she was not injured that bad. She further testified that the police did not ask her any questions about what had happened, that they questioned only her mother, and that she spoke with Detective Anderson a couple of weeks later.[47] Officer Darr's testimony hardly establishes the extent of any police questioning of Janai over and above the inquiry as to her injuries. In any event, establishing that the child did not correctly recall that – shortly after she watched her mother brutally attacked in front of a crowd of neighbors – the police actually asked her more questions hardly would have put the lie to her testimony. There was not a reasonable probability that impeachment on such a collateral point would have changed the outcome at trial.

Petitioner's reliance on item (6), similar to his reliance on item (3), is problematic for a number of substantial reasons. Petitioner maintains in item (6) that trial counsel should have used Janai's statements to Detective Anderson that, when White and Shelton were at the top of the staircase, White tried to stab her three or four times, in order to impeach Janai's testimony that she really did not see White try to stab Shelton and that she did not remember that part. First, petitioner misstates Janai's trial testimony. Janai initially testified that she did not recall whether White went after Shelton with the knife while they were at the top of the stairs. After the State refreshed her recollection by referring to her preliminary hearing testimony, however, Janai testified to the effect that her recollection was refreshed and that White stabbed at Shelton with the knife.[48] There thus was nothing in the trial testimony for defense counsel to impeach with the prior statement to Detective Anderson. Second, as with item (3), defense counsel then would have been impeaching the witness with a prior statement that was more damaging to White than Janai's trial testimony on direct, which, once

---

[46]#68-13, Ex. AA, Part 5, at 110-11.

[47]#68-11, Ex. AA, Part 2, at 39-40; #68-12, Ex. AA, part 3, at 56.

[48]#68-11, Ex. AA, Part 2, at 33-34.

again, generally is not a strategy that produces a net positive outcome for the defense.  Third, also similar to item (3), in all events, the prosecution presented testimony as to substantially similar statements to Detective Anderson during Anderson's testimony.[49]  The substance of the testimony that petitioner urges should have been presented to the jury thus in fact was presented to the jury.  Petitioner accordingly cannot demonstrate prejudice in this regard.

By his own admission, White, in view of multiple witnesses, was choking Shelton while she begged him not kill her, and he continued choking her despite her pleas until he was forcibly removed from her.  There was not a reasonable probability that a jury would seize upon the foregoing alleged inconsistencies and nuances between prior statements, or reports of statements, and testimony by the child to disregard her testimony, which was corroborated by her brother's testimony.  Petitioner urges that impeachment on these nuances would have led the jury to believe that the child was committing perjury.  However, there was not a reasonable probability that such tangential impeachment of Janai would have led a jury to disregard the two children's testimony in favor of the testimony of a convicted felon who continued choking a woman begging for her life until he was forcibly pulled from her.

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law.

Ground 6(a) does not provide a basis for federal habeas relief.

### Grounds 6(b) & (c)

Petitioner contends that counsel was ineffective for failing to impeach Joya Shelton and Detective Anderson with their alleged prior inconsistent statements.  Petitioner premises this claim or claims upon a conflict in the trial testimony wherein Shelton testified that she handed the knife to Anderson and Anderson testified that she recalled that she picked up the knife from the apartment without Shelton being there. #4, at 13-A.

---

[49]#69-2, Ex. BB, Part 1, at 15-16.  Again, the fact that the prosecution brought out the statements – in response to testimony that defense counsel elicited on cross-examination of Janai – tends to reinforce the point that the statements helped the State more than the defense, such that defense counsel was not ineffective for not trying to impeach Janai's testimony on this basis.

1    The Supreme Court of Nevada rejected the claim or claims presented to that court on

2    the following grounds:

3                    . . . White argued that his trial counsel was ineffective for
                  failing to adequately impeach Detective Anderson and Shelton
4                  with prior inconsistent statements concerning whether Shelton
                  personally handed Detective Anderson the knife.  We conclude
5                  that White did not demonstrate that the outcome of his trial would
                  have been different if his counsel had questioned the witness in
6                  this regard, and we therefore affirm the order of the district court.

7    #11, Ex. P, at 9-10 (at electronic docketing pages 477-78).

8    The state high court's rejection of this claim was neither contrary to nor an

9    unreasonable application of *Strickland*.

10    At the very outset, White's argument is fundamentally flawed.  He has identified no

11   basis for impeaching either Shelton or Anderson based upon a prior inconsistent statement.

12   At best, he has identified an inconsistency between the testimony of two different witnesses

13   – at the trial – on a collateral point.[50]  In order to impeach a witness based upon a prior

14   inconsistent statement, a party uses a prior statement *by that witness* that is inconsistent with

15   *their* trial testimony.  The fact that another witness testifies differently at some other point in

16   the trial as to a fact provides absolutely no basis for impeaching either witness' testimony.

17    Moreover, the inconsistency in the two witnesses' testimony on this point was in

18   evidence before the jury.  Defense counsel, who did query Shelton on the point, did not need

19   to "impeach" either witness to get the inconsistency in the testimony before the jury.[51]

20    The state court's rejection of this claim was neither contrary to nor an unreasonable

21   application of clearly established federal law.

22    Grounds 6(b) and (c) therefore do not provide a basis for federal habeas relief.

23

24   ───────────────

25   [50]Compare #69-3, Ex. BB, Part 2, at 32-33 (Detective Anderson testified that, while she was at the
apartment on two to three occasions, "I don't believe" that Shelton was present that day, that "I think she was
working" that day, and that Shelton had set the knife aside for her to retrieve) with #69-4, Ex. BB, Part 3, at
26   72-75 and #69-5, Ex. BB, Part 4, at 95-97 (Shelton testified that she personally handed the knife over to
Detective Anderson).

27
[51]See #69-5, Ex. BB, Part 4, at 96.  As discussed further, *infra*, as to Ground 10, the mere fact that
28   two State witnesses had different recollections on a factual point does not establish perjury.

-34-

1    ***Ground 7:  Admission of Shonda Carlton's Preliminary Hearing Testimony***

2            In Ground 7, petitioner alleges that he was denied rights to a fair trial and due process

3    of law and to confront the witnesses against him when the trial court allowed Shonda

4    Carlton's preliminary hearing testimony to be read to the jury.

5            The Supreme Court of Nevada held that the claims of trial error presented for the first

6    time in White's state post-conviction petition, including the above claims, were procedurally

7    barred under N.R.S. 34.810(b)(1) because the claims were not raised on direct appeal.  This

8    Court accordingly held that Ground 7 was barred under the federal procedural default doctrine

9    unless the petitioner could demonstrate ineffective assistance of appellate counsel in failing

10   to raise the barred claims now presented in federal Ground 7.  As the Court noted in its prior

11   order, petitioner's claim of cause and prejudice based upon ineffective assistance of appellate

12   counsel stands on a weak footing.  Petitioner did not present a claim of ineffective assistance

13   of appellate counsel in the state courts premised specifically upon the failure to raise the

14   constitutional claims in federal Ground 7.  The closest claim presented was a generalized

15   claim that appellate counsel failed to communicate with petitioner.[52]

16           In any event, this Court is not persuaded that petitioner has established that appellate

17   counsel was ineffective for failing to raise federal Ground 7 on direct appeal.  Petitioner's logic

18   in Ground 7 is flawed to the point of not making any sense whatsoever.  Petitioner suggests

19   that Carlton was "a crucial witness" for the defense, and he outlines all of the features of her

20   testimony that he believes were beneficial for the defense case.  He maintains that the

21   prosecutor filed an affidavit as to her investigator's inability to locate Carlton for trial "for the

22   sole purpose of concealing the truth of what Ms. Carlton would have testified to."[53]  The

23   fundamental flaw in petitioner's argument is that Shonda Carlton's preliminary hearing

24   testimony contained all of the testimony to which petitioner refers.  Indeed, White cites to the

25   very preliminary hearing testimony that was read to the jury when he outlines the testimony

26   _____

27           [52]See #52, at 9-13.

28           [53]#4, at 15-A to 15-B.

that allegedly was "concealed" by the prosecution.  Carlton's preliminary hearing testimony was read at trial, such that all of the testimony White identifies was presented to the jury.[54]

Appellate counsel clearly did not provide ineffective assistance of counsel by failing to communicate with petitioner regarding, or failing to raise, such a fundamentally flawed claim on direct appeal.  Petitioner thus cannot establish cause and prejudice.[55]

Ground 7 therefore is barred by procedural default.

### Ground 8: Failure of Appellate Counsel to Communicate with Petitioner

In Ground 8, petitioner alleges that he was denied effective assistance of counsel when his appellate counsel failed to communicate with him and failed to raise meritorious claims on direct appeal that he requested.

The Supreme Court of Nevada rejected this claim on the following grounds:

> . . . White alleged that his appellate counsel was ineffective for failing to communicate with him.  White failed to demonstrate the existence of an issue that had a reasonable likelihood of success on appeal, and he therefore did not establish that he was prejudiced by his counsel's alleged failure to communicate.  Thus, we affirm the district court's denial of his claim.

#11, Ex. P, at 12 (at electronic docketing page 480).

---

[54]See text and record citations, *supra*, at 3.

[55]Petitioner asserts in the federal petition that, "from behind prison walls" a month later in September 1999, he was able to locate Shonda Carlton.  He additionally maintains that at his November 1999 sentencing hearing he stated on the record that he had located Shonda Carlton but that this information was purposely taken off the record to conceal the fact that he had located Carlton.  These assertions do not lead to a different result even if, *arguendo*, a habeas petitioner may obtain relief on a bald uncorroborated assertion that contradicts the state court record transcripts.  None of the foregoing would have been pertinent to the record on appeal pertaining to the point in time that the state district court allowed the reading of Carlton's preliminary hearing testimony at the August 1999 trial.  The issue of Carlton's availability was argued to the state district court on the record presented at that time.  See #68-8, Ex. Y, at 32-33.  What White allegedly may have found out later after trial as to Carlton's location had no bearing upon whether the trial court erred based upon the record presented at the time of its ruling.  In all events, however, regardless of the record vis-à-vis Carlton's availability at the time of trial, White's claim at bottom is based upon the fundamentally flawed premise that the State concealed the very testimony that it in fact introduced over a defense objection.  The claim urged by White in Ground 7 therefore in no sense would have presented a viable claim on direct appeal.

White's additional claim under Ground 7 that the state trial court deprived him of an opportunity to cross-examine the State's investigator similarly would not have presented a viable claim on direct appeal.  The trial record does not reflect that the defense asked for an opportunity to cross-examine the investigator after the State's affidavit was filed.  See #68-8, Ex. Y, at 32.

1   The state supreme court's rejection of this claim was neither contrary to nor an

2   unreasonable application of clearly established federal law.  A criminal defendant does not

3   have a right to have his appointed appellate counsel present every nonfrivolous issue that he

4   requests.  *See Jones v. Barnes*, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983).  The

5   appellate issues that White sought to raise all lacked merit.[56]  The state supreme court's

6   rejection of this claim of ineffective assistance of appellate counsel therefore was neither

7   contrary to nor an unreasonable application of *Strickland*, as petitioner cannot demonstrate

8   the requisite prejudice on this claim.

9       Ground 8 therefore does not provide a basis for federal habeas relief.

10   **Ground 9: Dangerous Weapon**

11       In Ground 9, petitioner alleges that he was denied rights to a fair trial and due process

12   of law "because the trial court erroneously concluded that [the] alleged steak knife was a

13   deadly weapon, and erroneously instructed the jury on what constitutes a deadly weapon."[57]

14       As noted on Ground 7, the Supreme Court of Nevada held that the claims of trial error

15   presented for the first time in White's state post-conviction petition, including the above

16   claims, were procedurally barred under N.R.S. 34.810(b)(1) because the claims were not

17   raised on direct appeal.  This Court accordingly held that Ground 9 was barred under the

18   federal procedural default doctrine unless the petitioner could demonstrate ineffective

19   assistance of appellate counsel in failing to raise the barred claims now presented in federal

20   Ground 9.  As the Court noted in its prior order, petitioner's claim of cause and prejudice

21

22       [56]The Court cross-references to its decision on Grounds 5(a), 7, 9, 10, 11, 12, 13, and 15.

23       Petitioner urges in the federal petition that the State and the state district court conceded on his state
      post-conviction petition that his appellate issues were meritorious when the State and state court stated that

24   the issues should have been raised on direct appeal.  What the State and state court instead were indicating,
      however, was that petitioner's substantive claims were procedurally defaulted because they had not been

25   presented on direct appeal.  See #11, Ex. L (electronic docketing pages 421-28).  Neither the State nor the
      state court made any statement signifying that petitioner had meritorious appellate claims.  It is precisely this

26   sort of frivolous logic that permeates the claims that petitioner urges that appellate counsel should have
      pursued on direct appeal.  While petitioner may have persuaded himself with such flawed logic, viewed

27   objectively, there was not a reasonable probability that any of the claims would have succeeded on appeal.

28       [57]#4, at 19.

1   based upon ineffective assistance of appellate counsel stands on a weak footing.  Petitioner

2   did not present a claim of ineffective assistance of appellate counsel in the state courts

3   premised specifically upon the failure to raise the constitutional claims in federal Ground 9.

4   The closest claim presented was a claim that counsel did not communicate with White.[58]

5          In any event, this Court is not persuaded that petitioner has established that appellate

6   counsel was ineffective for failing to raise federal Ground 9 on direct appeal.  Petitioner

7   alleges at the beginning of the claim that the state trial court erroneously concluded that the

8   steak knife was a dangerous weapon and erroneously instructed the jury as to what

9   constitutes a dangerous weapon.  Petitioner provides absolutely no argument, however, in

10  any way indicating that a steak knife did not constitute a dangerous weapon under Nevada

11  law at the time of his offense, and he similarly provides no argument articulating how the trial

12  court's jury instruction allegedly was erroneous (much less an error of constitutional

13  magnitude).  What petitioner instead provides is a rehash of the same logically flawed and

14  frivolous argument that he presents under federal Ground 4 that the knife introduced at his

15  trial was fraudulent evidence.[59]   Appellate counsel clearly did not provide ineffective

16  assistance of counsel by failing to communicate with petitioner regarding, or failing to raise,

17  such a fundamentally flawed claim on direct appeal.  White's underlying argument did not

18  establish that a steak knife was not a dangerous weapon, did not establish that the jury

19  instruction was erroneous, and, most importantly, did not establish an error of constitutional

20  dimension as to either issue.  Petitioner thus cannot establish cause and prejudice.

21          Ground 9 therefore is barred by procedural default.[60]

22          / / / /

23

24          [58]See #52, at 9-13.

25          [59]#4, at 19-19B.

26          [60]Petitioner refers to a passing statement by the state district court at sentencing, months after the
27  trial, that petitioner used a dangerous weapon, his hands, when he choked Shelton.  See #69-8, Ex. DD, at
    10.  The post-trial statement had no bearing upon whether the trial court correctly determined at trial that a
    steak knife constituted a dangerous weapon and/or properly instructed the jury at trial. The jury charges
28  instead were based upon a knife being a deadly weapon.  See #69-21, Ex. KKK, Instruction No. 11.

***Grounds 10, 11 & 12:  Alleged Knowing Use of Perjured Testimony***

Grounds 10, 11, and 12 all are based upon a core contention that the State knowingly used perjured testimony.  Grounds 10 and 11 further are based generally upon the same underlying factual allegations.

In Ground 10, petitioner alleges that he was denied rights to a fair trial and due process of law because of alleged prosecutorial misconduct due to the State's alleged knowing use of perjured testimony.  In Ground 11, petitioner alleges that he was denied rights to a fair trial, due process of law, and to have witnesses testify in his favor when the lead detective allegedly used coercive and suggestive interviewing techniques to suborn perjury.  In support of Grounds 10 and 11, petitioner alleges that the child Janai committed perjury and that Detective Anderson used coercive and suggestive techniques to suborn Janai's alleged perjury.

In Ground 12, petitioner alleges that he was denied rights to a fair trial and due process of law when the prosecutor allegedly failed to correct the testimony of State witnesses known to the prosecutor to be false.  In support of Ground 12, petitioner alleges that the inconsistency between the testimony by Detective Anderson and Joya Shelton regarding the delivery of the knife to Anderson demonstrates that the State failed to correct perjured testimony.

As noted on Ground 7, the Supreme Court of Nevada held that the claims of trial error presented for the first time in White's state post-conviction petition, including the above claims, were procedurally barred under N.R.S. 34.810(b)(1) because the claims were not raised on direct appeal.  This Court accordingly held that Grounds 10, 11 and 12 were barred under the federal procedural default doctrine unless the petitioner could demonstrate ineffective assistance of appellate counsel in failing to raise the barred claims now presented in the federal petition.[61]

/ / / /

_____

[61]See #52, at 9-13.

1    In this instance, the claims of ineffective assistance of appellate counsel were

2    presented to, and rejected by, the Supreme Court of Nevada.  The state high court rejected

3    the claims on the following grounds:

4

5    . . . White alleged that his appellate counsel was ineffective
     for failing to raise the following issues on appeal: the prosecutor
     was aware his daughter was committing perjury during trial;

6    Detective Anderson suborned perjury and rendered his daughter
     incompetent to testify; and the prosecutor should have corrected

7    Detective Anderson's erroneous testimony.  White did not
     demonstrate that an appeal of these issues had a reasonable

8    probability of success, or that his counsel acted objectively
     unreasonable in failing to pursue them.  We therefore affirm the

9    district court's denial of these claims.

10   #11, Ex. P, at 11 (at electronic docketing page 479).

11   On *de novo* review, in applying the federal procedural default doctrine, this Court

12   concurs that petitioner cannot demonstrate ineffective assistance of appellate counsel in

13   failing to raise the claims in federal Grounds 10, 11, and 12, because the claims did not have

14   a reasonable probability of success on direct appeal.

15   In order to obtain relief for prosecutorial use of alleged perjured testimony at trial, the

16   petitioner must show that: (1) the trial testimony was actually false; (2) the prosecution knew

17   or should have known that the testimony was actually false; and (3)  the false testimony was

18   material.  *See, e.g., United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003)(*Zuno-Arce*

19   *III*)(denying COA on issue following denial of federal post-conviction relief); *United States v.*

20   *Zuno-Arce*, 44 F.3d 1420, 1423 (9th Cir. 1995)(*Zuno-Arce I*)(on direct appeal).  The mere fact

21   that a witness' trial testimony varies from prior statements and testimony establishes neither

22   that the trial testimony was actually false nor that the prosecution knew or should have known

23   of the alleged falsity of the testimony.  *See Zuno-Arce III*, 339 F.3d at 889; *Zuno-Arce I*, 44

24   F.3d at 1422-23.  As the Ninth Circuit observed in *Zuno-Arce I*, lawyers necessarily must rely

25   upon the jury to determine what is true or whether a reasonable doubt as to the truth exists;

26   the determination of credibility is for the jury.  44 F.3d at 1423.

27   Grounds 10 and 11 at bottom are based upon alleged inconsistencies between Janai's

28   alleged statements and preliminary hearing testimony and her trial testimony -- along with the

essentially unsupported assertion that, because of these alleged inconsistencies, Detective Anderson necessarily suborned perjury and coerced Janai into changing her story.  This Court fully canvassed these alleged inconsistencies, as well as what the record presented to the state courts reflected as to Detective Anderson's interview, *supra,* in the course of discussing Grounds 2(a), 2(c), 3(b) and, in particular, 6(a).  Petitioner, at best, has demonstrated nothing more than various alleged inconsistencies in Janai's alleged statements and testimony.  It is established law that the mere presence of inconsistent statements or testimony demonstrates neither perjury, knowing use of perjured testimony by the State, nor improper coaching by State authorities.  *See, e.g., Zuno-Arce III, supra.*  Petitioner's claims in this regard therefore had essentially no chance of success on appeal, and his appellate counsel did not provide ineffective assistance in failing to raise these claims.

Similarly, Ground 12 is based upon inconsistencies between the trial testimony of Detective Anderson and Joya Shelton regarding the transfer of the knife from Shelton to Anderson.  This Court discusses this inconsistency, *supra*, under Grounds 6(b) and (c).  The mere fact that two prosecution witnesses had differing recollections as to whether a piece of evidence was personally handed over or instead left on a counter to be picked up does not establish that the State knowingly used perjured testimony, much less on a material point, or had an obligation to correct the testimony.  The inconsistency between the two witnesses' recollection already was of record before the jury.  The matter of determining what significance, if any, to attach to the inconsistency clearly was for the jury.  Petitioner's claims on Ground 12 therefore also had no chance of success on appeal, and his appellate counsel did not provide ineffective assistance in failing to raise these claims.

Grounds 10, 11 and 12 therefore are barred by procedural default, as petitioner cannot demonstrate cause and prejudice based upon alleged ineffective assistance of appellate counsel in failing to raise these meritless claims on direct appeal.

### Ground 13:  Denial of Pro Se Cross-Examination of Witness

In Ground 13, petitioner alleges that he was denied rights to a fair trial, due process, and counsel when the trial court, prosecutor and defense counsel allegedly prohibited him

1  from cross-examining Detective Anderson regarding statements in police reports.   For

2  purposes of analysis, the Court has subdivided this claim into Ground 13(a), with regard to

3  the action of the trial court and prosecutor, and Ground 13(b), with regard to the action of

4  defense counsel.

5          As discussed above under Ground 2(a), White interrupted Detective Anderson's trial

6  testimony and sought to present *pro se* argument on the record.   The trial court sent the jury

7  out and let White speak his piece on the record outside the presence of the jury.   White

8  requested that the Court order Detective Anderson to read to the jury the portion of the

9  August 2, 1998, report by the police officers who conducted the initial investigation stating that

10  no other witnesses saw White try to stab Shelton.   After White spoke, defense counsel noted

11  that Detective Anderson had acknowledged on cross-examination that no witnesses other

12  than Shelton and the two children stated that White attempted to stab Shelton.   The State

13  objected to anything being read from the police reports because the reports were hearsay,

14  noting that the report was based upon hearsay from an officer or officers to another officer.

15  The State further noted that counsel had agreed to bring the testimony as to the lack of other

16  witnesses to the attempted stabbing through Detective Anderson rather than recalling Officer

17  Darr.   After hearing from both counsel and from White himself, the state trial court stated that

18  the court was not going to allow the police reports to be introduced or read into evidence.[62]

19          ***Ground 13(a)***

20          As noted on Ground 7, the Supreme Court of Nevada held that the claims of trial error

21  presented for the first time in White's state post-conviction petition, including the claims in

22  Ground 13(a), were procedurally barred under N.R.S. 34.810(b)(1) because the claims were

23  not raised on direct appeal.   This Court accordingly held that Ground 13(a) was barred under

24  the federal procedural default doctrine unless the petitioner could demonstrate ineffective

25  assistance of appellate counsel in failing to raise the barred claims now presented in federal

26  Ground 13(a).   As the Court noted in its prior order, petitioner's claim of cause and prejudice

27  _____

28          [62]#69-3, Ex. BB, Part 2, at 41-45.

-42-

1    based upon ineffective assistance of appellate counsel stands on a weak footing.  Petitioner

2    did not present a claim of ineffective assistance of appellate counsel in the state courts

3    premised specifically upon the failure to raise the constitutional claims in federal Ground

4    13(a).  The closest claim presented was a generalized claim that appellate counsel failed to

5    communicate with petitioner.[63]

6        In any event, this Court is not persuaded that petitioner has established that appellate

7    counsel was ineffective for failing to raise federal Ground 13(a) on direct appeal or for failing

8    to communicate with him regarding the claims.  There was not a reasonable probability that

9    the claim would have changed the outcome on appeal.  White urges that there were "dramatic

10   inconsistencies" between the police reports and the testimony.  However, the state trial court's

11   assessment that, in context, the point was "of very little consequence" hits closer to the

12   mark.[64]  As discussed in more detail, *supra*, as to Ground 2(a), the statement in the initial

13   police report that "Shelton stated that White attempted to stab her with the knife, but there

14   were no witnesses to this fact" had far less compelling significance in the context of all of the

15   evidence than White seeks to attach to it.  There was not a reasonable probability that

16   White's core suggestion -- that the statement in the police report established that Janai

17   committed perjury after coaching by Detective Anderson -- would prove persuasive on appeal.

18   Nor was there a reasonable probability that an argument that the action of the trial court and

19   prosecutor denied petitioner federal constitutional rights to a fair trial and due process would

20   prove persuasive on appeal.[65]

21       / / / /

22

23   _____

     [63]See #52, at 9-13.

24
     [64]#69-3, Ex. BB, Part 2, at 43.
25
     [65]Nor was Detective Anderson's statement in an August 4, 1998, report that the knife could not be
26   located a "smoking gun" that put the lie to the State's case.  Anderson made the statement two days after,
     apparently unbeknownst to her at the time, police officers had given the knife back to Shelton and
27   approximately two weeks before the knife was made available to her by Shelton.  See also note 29, *supra*
     (related discussion).  These sort of alleged inconsistencies simply do not have the dramatic exculpatory
28   impact that White believes that they have.

                                            -43-

1    Appellate counsel thus did not provide ineffective assistance of counsel by failing to

2    communicate with petitioner regarding, or failing to raise, these claims on direct appeal.

3    Petitioner accordingly cannot establish cause and prejudice.

4    Ground 13(a) therefore is barred by procedural default.

5    **Ground 13(b)**

6    The Supreme Court of Nevada rejected the accompanying claim of ineffective

7    assistance of trial counsel on the following grounds:

> . . . White alleged that his trial counsel was ineffective for
> failing to impeach Detective Anderson with a police report written
> by another officer.   Specifically, White wanted Detective
> Anderson to read aloud the following portion of the police report:
> "Shelton stated that White attempted to stab her with a knife, but
> there were no witnesses to this fact."
>
> A review of the record reveals that at the conclusion of
> Detective Anderson's testimony, White directly addressed the
> district court and requested that Detective Anderson read the
> police report in front of the jury.   The State objected on the
> grounds of hearsay.   The district court denied White's request,
> noting, "in the context of things . . . it's of very little consequence."
> We conclude that White did not establish that he was prejudiced
> by his counsel's failure to attempt to impeach Detective Anderson
> with the police report, as he did not demonstrate that it was
> admissible.   Moreover, in view of the significant amount of
> evidence presented against him, White did not demonstrate the
> outcome of his trial would have been different if the jury had been
> given this information.   Therefore, we affirm the district court's
> denial of this claim.

19    #11, Ex. P, at 8-9 (at electronic docketing pages 476-77)(citation footnote omitted).

20    Given this Court's prior discussion of Grounds 2(a) and 13(a), the state supreme

21    court's rejection of this claim was neither contrary to nor an unreasonable application of

22    *Strickland*.

23    Ground 13(b) does not provide a basis for federal habeas relief.

24    **Ground 14:  Failure to Raise Issues on Appeal and Alleged Misleading Motion**

25    In Ground 14, petitioner alleges that he was denied effective assistance of counsel

26    when his appellate counsel failed to raise meritorious claims on direct appeal that he

27    requested and filed an allegedly misleading motion in the state supreme court.  Petitioner

28    maintains that his replacement appellate counsel, William J. Taylor, just as with his original

-44-

appellate counsel, failed to present the appellate issues that he requested.  He further maintains that Taylor filed a misleading motion in the state supreme court containing false statements as to the issues on appeal.

The petitioner appears to have raised this claim in the state courts.[66]  However, it does not appear that the Supreme Court of Nevada addressed this particular claim, at least separate and apart from the substantially overlapping claim of ineffective assistance of counsel discussed above under Ground 8.  This Court, *arguendo*, will address the claim on *de novo* review rather than under the deferential AEDPA standard.

In its prior order, the Court summarized in detail the relevant procedural history on direct appeal concerning White's disagreements with his original and replacement appellate counsel and his efforts to present appellate claims *pro se*.  In broad overview, original appellate counsel filed a fast track statement presenting certain claims, and counsel then was allowed to withdraw, following upon disagreements with White.  After Taylor was appointed as replacement appellate counsel on April 25, 2001, he subsequently sought a ninety day extension on June 18, 2001, to file the supplemental fast track statement.  In a June 21, 2001, order the Supreme Court of Nevada granted counsel a thirty day extension of time to file a supplemental fast track statement.[67]

Petitioner alleges in Ground 14 that the response that Taylor filed following upon the June 21, 2001, order was misleading and contained false information.

In counsel's July 23, 2001, response to the June 21, 2001, order, counsel stated that "based on the information presently in the possession of current appellate counsel, there is presently no material issue to be considered that was not raised in the original fast track statement."  He stated, however, that White had directed him to request an additional sixty day extension to file a supplemental fast track statement.  Counsel stated that "Mr. White is

---

[66]See #11, Ex. H, Memorandum of Point and Authorities, at 121-30 (at electronic docketing pages 269-278).

[67]See #52, at 2-3.

1    concerned that additional documentation and information needs to be acquired before a

2    determination can be made concerning a supplemental fast track statement."[68]

3        On July 30, 2001, the state supreme court received a *pro se* notice from White seeking

4    a sixty day extension of time to file a *pro se* brief, with an attached partial rough draft of a *pro*

5    *se* brief.   On August 6, 2001, the state supreme court denied the request for a sixty-day

6    extension on the request made in counsel's July 23, 2001, filing.   Two days later, on August

7    8, 2001, the state supreme court issued an order affirming the judgment of conviction.   The

8    court addressed only the issues raised in the fast track statement, and, as discussed in detail

9    in this Court's prior order, the state supreme court did not address any of the issues in the *pro*

10   *se* rough draft brief attached with the *pro se* request for a sixty-day extension.[69]

11       On *de novo* review, this Court holds that replacement appellate counsel did not provide

12   ineffective assistance of counsel, in any respect.

13       First, counsel's July 23, 2001, filing was not misleading, and it did not contain false

14   information.   The filing clearly reflected that counsel did not believe that there were any further

15   material issues to be presented but that White himself wanted an additional sixty days to file

16   a supplemental fast track statement.   The filing reflected exactly the situation that then

17   existed, *i.e.*, that counsel did not believe that there were any additional material issues but

18   that White did and wanted more time to raise them.   In any event, petitioner was not

19   prejudiced by counsel' action because, as discussed below, the additional issues that White

20   wanted to present did not have a reasonable probability of success.

21       Second, counsel was not ineffective for failing to raise the issues that White wanted

22   him to raise.   As discussed above under Ground 8, a criminal defendant does not have a right

23   to have his appointed appellate counsel present every nonfrivolous issue that he requests.

24   *See Jones v. Barnes*, *supra*.   Petitioner urges that once Taylor learned of the issues that

25   White wanted to raise, counsel "tucked tail and ran for cover," filing the statement discussed

26   _____

27       [68]See #52, at 4.

28       [69]See #52, at 4-7 & 10-12.

above with the state supreme court.   Petitioner states that these issues included: "Prosecutorial Misconduct Issues; Known Use of Perjured Testimony; Use of Fraudulent Evidence; and that Det. Anderson, and Ms. Shelton coerced and coached Janai into false swearing in state court."[70]  If counsel indeed "tucked tail and ran for cover," he did so with good reason.  The appellate issues that White sought to raise all lacked merit.[71]  Petitioner therefore cannot demonstrate the requisite prejudice on this claim.

On *de novo* review, Ground 14 therefore does not provide a basis for federal habeas relief.

### Ground 15: Sufficiency of the Evidence and Cumulative Error

In Ground 15, petitioner alleges that he was denied rights to a fair trial, due process and equal protection because the evidence was insufficient to convict him of attempted murder with the use of a deadly weapon and of child abuse and neglect.  He further includes a passing reference in the claim "to the above stated 'cumulative errors.'"

At the outset, this Court does not have jurisdiction over the subject matter as to the challenge to the conviction for child abuse and neglect.  White was sentenced on that charge in the November 22, 1999, judgment of conviction to a one-year sentence to run concurrent with the sentence on the conviction for attempted murder with the use of a deadly weapon. The sentence on the conviction for child abuse and neglect therefore would appear to have fully expired long before the mailing of the federal petition for filing on or about April 26, 2005. As a general rule, a petitioner no longer is in custody for purposes of asserting federal habeas

---

[70]#4, at 29.

[71]The Court cross-references to its decision on Grounds 5(a), 7, 9, 10, 11, 12, 13, and 15.

Petitioner urges in the federal petition that the State and the state district court conceded on his state post-conviction petition that his appellate issues were meritorious when the State and state court stated that the issues should have been raised on direct appeal.  What the State and state court instead were indicating, however, was that petitioner's substantive claims were procedurally defaulted because they had not been presented on direct appeal.  See #11, Ex. L (at electronic docketing pages 421-28).  Neither the State nor the state court made any statement signifying that petitioner had meritorious appellate claims.  It is precisely this sort of frivolous logic that permeates the claims that petitioner urges that appellate counsel should have pursued on direct appeal.  While petitioner may have persuaded himself with such flawed logic, viewed objectively, there was not a reasonable probability that any of the claims would have succeeded on appeal.

jurisdiction where the sentence imposed has fully expired prior to the filing of the federal petition. *See,e.g., Maleng v. Cook*, 490 U.S. 488, 492,109 S.Ct. 1923, 1926, 104 L.Ed.2d 540 (1989); *Henry v. Lungren*, 164 F.3d 1240, 1241 (9ᵗʰ Cir.), *cert. denied*, 528 U.S. 963, 120 S.Ct. 397, 145 L.Ed.2d 309 (1999). However, in *Garlotte v. Fordice*, 515 U.S. 39, 115 S.Ct. 1948, 132 L.Ed.2d 36 (1995), the Supreme Court held that a habeas petitioner serving consecutive sentences is in custody under an earlier expired consecutive sentence until all of the consecutive sentences have expired, such that he can challenge an earlier expired consecutive sentence while serving later consecutive sentences. Applying the foregoing principles to this case, the Court not have jurisdiction over the petitioner's challenge to his conviction for child abuse and neglect because his expired sentence on that charge ran concurrently with the other sentences imposed. *See Maleng, supra.*

In any event, as noted on Ground 7, the Supreme Court of Nevada held that the claims of trial error presented for the first time in White's state post-conviction petition, including the claims challenging the sufficiency of the evidence in Ground 15, were procedurally barred under N.R.S. 34.810(b)(1) because the claims were not raised on direct appeal. This Court accordingly held that Ground 15 was barred under the federal procedural default doctrine unless the petitioner could demonstrate ineffective assistance of appellate counsel in failing to raise the barred claims now presented in the federal petition.[72]

In this instance, the claim of ineffective assistance of appellate counsel was presented to, and rejected by, the Supreme Court of Nevada. The state high court rejected the claim on the following grounds:

> . . . White argued that his appellate counsel was ineffective for failing to challenge the sufficiency of the evidence. We disagree.
>
> Evidence is sufficient to uphold a conviction when a reasonable jury could have been convinced of the defendant's guilt beyond a reasonable doubt. "[T]he test . . . is not whether this court is convinced of the defendant's guilt beyond a

---

[72]See #52, at 9-13.

-48-

reasonable doubt, but whether the jury, acting reasonably, could be convinced to that certitude of evidence it had a right to accept." We conclude that sufficient evidence was presented at White's trial from which a rational jury could find him guilty of attempted murder with the use of a deadly weapon and child abuse and neglect, such that he did not establish that his counsel was ineffective for failing to argue this on appeal. The State presented evidence that White attacked Shelton and chased her out of the apartment with a knife, pushing his ten-year old daughter out the way in the process. Once outside, White attempted to stab Shelton while his daughter was watching. We therefore conclude that the district court did not err in denying White relief on this claim.

#11, Ex. P, at 11-12 (at electronic docketing pages 479-80)(citation footnotes omitted).

On *de novo* review, in applying the federal procedural default doctrine, this Court concurs that petitioner cannot demonstrate ineffective assistance of appellate counsel in failing to raise the claims of insufficiency of the evidence in federal Ground 15, because the claims did not have a reasonable probability of success on direct appeal.

On a challenge to the sufficiency of the evidence, the petitioner faces a "considerable hurdle." *Davis*, 333 F.3d at 992. Under the standard announced in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the jury's verdict must stand if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *E.g., Davis*, 333 F.3d at 992. Accordingly, the reviewing court, when faced with a record of historical facts that supports conflicting inferences, must presume that the trier of fact resolved any such conflicts in favor of the prosecution and defer to that resolution, even if the resolution by the state court trier of fact of specific conflicts does not affirmatively appear in the record. *Id.* The *Jackson* standard is applied with reference to the substantive elements of the criminal offense as defined by state law. *E.g., Davis*, 333 F.3d at 992.

With regard to the conviction for attempted murder with the use of a deadly weapon, petitioner's arguments as to the sufficiency of the evidence constitute another rehash of his prior arguments that, *inter alia*, the State witnesses committed perjury, that Detective Anderson impermissibly coached Janai's testimony, that the knife was fraudulent evidence, and that the location of Shonda Carlton was concealed. All of these allegations, which had

no merit in the first instance on the preceding claims, have no bearing upon the issue of the sufficiency of the evidence supporting his conviction.  The sufficiency of the evidence is determined with regard to the evidence actually admitted at trial, and the evidence introduced at trial on the charge of attempted murder with the use of a deadly weapon clearly was sufficient to sustain his conviction.  Under the *Jackson* standard, any inconsistencies or conflicts in the evidence are presumed to have been resolved in favor of the prosecution.

With regard to the conviction for child abuse and neglect, even if the Court, *arguendo*, has jurisdiction over a challenge to that conviction, the evidence was sufficient to sustain that conviction as well.  White maintains that he only accidentally bumped into Janai and that she testified that she did not think that he was trying to hurt her.  Petitioner's logic again is flawed, however, because the charge for child abuse and neglect was not based solely upon White hitting or pushing Janai.  The charge instead was based, in substantial part, upon his violently attacking her mother in front of her and the mental trauma that his violence against her mother caused to her.[73]

There was not a reasonable probability that petitioner's challenges to the sufficiency of the evidence would have been successful on appeal.  Appellate counsel thus did not provide ineffective assistance of counsel by failing to raise these claims on direct appeal.  Petitioner accordingly cannot establish cause and prejudice.

The claims in Ground 15 challenging the sufficiency of the evidence therefore are barred by procedural default.

The Court further is not persuaded, on *de novo* review, that the reference to cumulative error in Ground 15, to the extent that the sentence fragment presents a sufficiently specific claim, presents a meritorious claim.  The claims of error presented by White have no more impact in the aggregate than they do in the singular.

Ground 15 therefore does not provide a basis for federal habeas relief.

---

[73] See, e.g., # 11, Ex. A, at electronic docketing pages 11-12 (criminal information); #69-7, Ex. BB, Part 6, at 150-53 (closing argument); #69-21, Ex. KKK, Instruction No. 15.

IT THEREFORE IS ORDERED that the remaining claims in the petition for a writ of habeas corpus shall be DENIED and this action DISMISSED:

      (a)    on the merits as to Grounds 1, 2, 3, 4, 5(b), 6, 8, 13(b), and 14 together with the challenge to the conviction for attempted murder with the use of a deadly weapon in Ground 15;

      (b)    on the basis of procedural default as to Grounds 5(a), 7, 9, 10, 11, 12, and 13(a); and

      (c)    for lack of jurisdiction over the subject matter as to the challenge to the conviction for child abuse and neglect in Ground 15.

The Clerk of Court shall enter final judgment accordingly, in favor of respondents and against petitioner, dismissing this action with prejudice as to all remaining claims challenging the conviction for attempted murder with the use of a deadly weapon and without prejudice for lack of jurisdiction over the subject matter as to any and all claims challenging the conviction for child abuse and neglect.

      DATED:  March 26, 2009.

_____
ROGER L. HUNT
Chief United States District Judge